Filed 7/3/14

# IN THE SUPREME COURT OF CALIFORNIA

BEACON RESIDENTIAL COMMUNITY )
ASSOCIATION, )
                                         )
       Plaintiff and Appellant, )
                                           )                S208173
      v. )
                                           )      Ct.App. 1/5 A134542
SKIDMORE, OWINGS & MERRILL LLP )
et al., )
                                           )     San Francisco County
       Defendants and Respondents. )   Super. Ct. No. CGC-08-478453
_____)

A homeowners association on behalf of its members sued a condominium developer and various other parties over construction design defects that allegedly make the homes unsafe and uninhabitable for significant portions of the year. Two defendants were architectural firms, which allegedly designed the homes in a negligent manner but did not make the final decisions regarding how the homes would be built. Applying our decision in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370 (*Bily*) and relying on *Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.* (2004) 125 Cal.App.4th 152 (*Weseloh*), the trial court sustained a demurrer in favor of the defendant architectural firms, reasoning that an architect who makes recommendations but not final decisions on construction owes no duty of care to future homeowners with whom it has no contractual relationship. The Court of Appeal reversed, concluding that an architect owes a

1

duty of care to homeowners in these circumstances, both under the common law and under the Right to Repair Act (Civ. Code, § 895 et seq.).

Building on substantial case law and the common law principles on which it is based, we hold that an architect owes a duty of care to future homeowners in the design of a residential building where, as here, the architect is a *principal architect* on the project — that is, the architect, in providing professional design services, is not subordinate to other design professionals. The duty of care extends to such architects even when they do not actually build the project or exercise ultimate control over construction. Accordingly, we affirm the judgment of the Court of Appeal.

## I.

In considering whether a demurrer should have been sustained, "we accept as true the well-pleaded facts in the operative complaint." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1189, fn. 1.) The facts alleged in plaintiffs' third amended complaint (the complaint) are as follows.

Skidmore, Owings & Merrill LLP (SOM) and HKS, Inc. (individually and doing business as HKS Architects, Inc.; hereafter HKS), are design professionals. SOM and HKS (collectively defendants) provided architectural and engineering services for The Beacon residential condominiums, a collection of 595 condominium units and associated common areas located in San Francisco (the Project). Although the units were initially rented out for two years after construction, defendants provided their services knowing that the finished construction would be sold as condominiums. A condominium association was formed, and the condominium's conditions, covenants, and restrictions were recorded, before construction commenced.

The homeowners association, plaintiff Beacon Residential Community Association (Association), sued several parties involved in the construction of

2

those condominiums, including several business entities designated as the original owners and developers of the condominium, as well as SOM and HKS, with whom the owners and developers contracted for architectural services. SOM and HKS were the only architects on the Project. Plaintiff alleged that negligent architectural design work performed by defendants resulted in several defects, including extensive water infiltration, inadequate fire separations, structural cracks, and other safety hazards. One of the principal defects is "solar heat gain," which made the condominium units uninhabitable and unsafe during certain periods due to high temperatures. Plaintiff alleged that the solar heat gain is due to defendants' approval, contrary to state and local building codes, of less expensive, substandard windows and a building design that lacked adequate ventilation. Defendants are named in the first cause of action ("Civil Code Title 7—Violation of Statutory Building Standards for Original Construction"), the second cause of action ("Negligence Per Se in Violation of Statute"), and the fifth cause of action ("Negligence of Design Professionals and Contractors").

According to the complaint, defendants "provided architectural and engineering services" for the Project that "included, but were not limited to, architecture, landscape architecture, civil engineering, mechanical engineering, structural engineering, soils engineering and electrical engineering, as well as construction administration and construction contract management." Defendants were paid more than $5 million for their work on the Project. In addition to "providing original design services at the outset" of the Project, defendants played an active role throughout the construction process, coordinating efforts of the design and construction teams, conducting weekly site visits and inspections, recommending design revisions as needed, and monitoring compliance with design plans.

3

Defendants demurred, contending they owed no duty of care to the Association or its members under the facts alleged.  The trial court agreed:  "The allegations do not show that either of the architects went beyond the typical role of an architect, which is to make recommendations to the owner.  Even if the architect initiated the substitutions, changes, and other elements of design that Plaintiff alleges to be the cause of serious defects, so long as the final decision rested with the owner, there is no duty owed by the architect to the future condominium owners, in the Court's view.  The owner made the final decision according to the third amended complaint."  The trial court granted plaintiff leave to amend the complaint to allege that defendants "actually dictated and controlled the decision to eliminate [ventilation] ducts, acting in a manner that was contrary to the directions of the owner, or that ignored the owner's directions," but plaintiff declined.

The Court of Appeal reversed.  It applied the factors set forth by this court in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*), for determining whether a party owes a duty of care to a third party and concluded that defendants owed a duty of care to the Association in this case.  The court distinguished *Weseloh*, *supra*, 125 Cal.App.4th 152, a case that found no duty of care owed by a design engineer to a commercial property owner, on the grounds that *Weseloh* was decided on summary judgment rather than demurrer and that *Weseloh* had expressly limited its holding to its facts.  The Court of Appeal further concluded that *Bily*, *supra*, 3 Cal.4th 370, did not support defendants' position.  Finally, the court concluded that the Right to Repair Act expressed a legislative intent to impose on design professionals a duty of care to future homeowners.  (See Civ. Code, § 895 et seq.)

We granted review.

## II.

"Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." (*United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.* (1970) 1 Cal.3d 586, 594.) This case is concerned solely with the first element of negligence, the duty of care. Whether a duty of care exists "in a particular case is a question of law to be resolved by the court. [Citation.] [¶] A judicial conclusion that a duty is present or absent is merely ' "a shorthand statement . . . rather than an aid to analysis . . . . '[D]uty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.] 'Courts, however, have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' " (*Bily*, *supra*, 3 Cal.4th at p. 397.)

Here we consider whether design professionals owe a duty of care to a homeowners association and its members in the absence of privity. Although the issue presented in this case has not been decided by this court, we do not write on a blank slate. As explained below, courts have found in a variety of circumstances that builders, contractors, and architects owe a duty of care to third parties.

## A.

Although liability for the supply of goods and services historically required privity of contract between the supplier and the injured party, the significance of privity has been greatly eroded over the past century. As we noted more than 50 years ago, "[l]iability has been imposed, in the absence of privity, upon suppliers of goods and services which, if negligently made or rendered, are 'reasonably certain to place life and limb in peril.' [Citations.] There is also authority for the imposition of liability where there is no privity and where the only foreseeable risk

5

is of damage to tangible property. [Citations.]" (*Biakanja*, *supra*, 49 Cal.2d at p. 649.) In *Biakanja*, we held that a notary public who negligently drafted a will was liable to the intended beneficiary of the will. (*Id.* at pp. 650–651.) We explained that "[t]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650.)

The declining significance of privity has found its way into construction law. We described the evolution in *Aas v. Superior Court* (2000) 24 Cal.4th 627 (*Aas*): "Formerly, after a builder had completed a structure and the purchaser had accepted it, the builder was not liable to a third party for damages suffered because of the work's condition, even though the builder was negligent. (E.g., *Fanjoy v. Seales* (1865) 29 Cal. 243, 249–250; see also *Hale v. Depaoli* [(1948)] 33 Cal.2d 228, 230 [reviewing the former law].) The purchaser, of course, had remedies against the builder in contract and warranty. But injured third parties had no clear remedy until we, following the trend that began with *MacPherson v. Buick Motor Co.* (1916) 217 N.Y 382 [111 N.E. 1050], qualified the general rule exonerating manufacturers from third party claims with an exception applicable whenever ' "the nature of a [manufactured] thing is such that it is reasonably certain to place life and limb in peril when negligently made . . . ." ' (*Kalash v. Los Angeles Ladder Co.* (1934) 1 Cal.2d 229, 231–232, quoting *MacPherson v. Buick Motor Co.*, *supra*, 111 N.E. 1050, 1053.) Having already held that the manufacturers of defective ladders [citation], elevators [citation], and tires [citation] could be liable to persons not in contractual privity with them yet foreseeably injured by their

6

products, we easily applied the same rule to someone responsible for part of a house, i.e., a defective railing (*Hale v. Depaoli*, at pp. 230–232).

"We first recognized a remedy in the law of negligence for construction defects causing property damage, as opposed to personal injury, in *Stewart v. Cox* [(1961)] 55 Cal.2d 857 [(*Stewart*)].  There, we upheld a homeowner's judgment against a subcontractor who had negligently applied concrete to the inside of a swimming pool, thereby causing the release of water that damaged the pool, lot and house.  In our opinion we noted, and seemingly were influenced by, the ' "decisions . . . plac[ing] building contractors on the same footing as sellers of goods, and . . . [holding] them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the negligence, even after acceptance of the work." ' (*Id.* at p. 862, quoting Prosser, Torts (2d ed. 1955) pp. 517–519.)" (*Aas*, *supra*, 24 Cal.4th at p. 637.)

The court in *Stewart* applied the *Biakanja* factors to determine the scope of the duty of care:  "Here it was obvious that the pool for which Cox provided the gunite work was intended for the plaintiffs and that property damage to them — and possibly to some of their neighbors — was foreseeable in the event the work was so negligently done as to permit water to escape.  It is clear that the transaction between [the pool subcontractor] and Cox was intended to specially affect plaintiffs.  There is no doubt that plaintiffs suffered serious damage, and the court found, supported by ample evidence, that the injury was caused by Cox's negligence.  Under all the circumstances Cox should not be exempted from liability if negligence on his part was the proximate cause of the damage to plaintiffs." (*Stewart*, *supra*, 55 Cal.2d at p. 863.)

Soon after, in *Sabella v. Wisler* (1963) 59 Cal.2d 21, we held that a contractor was liable to a homeowner, although the homeowner's identity was unknown at the time of construction.  The contractor had built a house on

7

inadequately compacted soil, causing major subsidence and property damage. Applying the *Biakanja* factors, we said that although "it appears that . . . this house was not constructed with the intention of ownership passing to these particular plaintiffs, the Sabellas are members of the class of prospective home buyers for which Wisler admittedly built the dwelling. Thus as a matter of legal effect the home may be considered to have been intended for the plaintiffs, and Wisler owed them a duty of care in construction. (See Prosser, Torts (2d ed. 1955) § 36, pp. 166–168.) It is apparent that harm was foreseeable to prospective owners when the home was constructed upon the inadequately compacted earth in the lot, and it is undisputed that the Sabellas' home was seriously damaged. Also, there was found to be a close connection between the negligent elements of workmanship for which defendant contractor must be held responsible . . . and the injury suffered." (*Sabella*, at p. 28.)

Courts have applied these third party liability principles to architects. In *Montijo v. Swift* (1963) 219 Cal.App.2d 351, the plaintiff sued an architect after falling and injuring herself on a stairway at a bus depot that she alleged had been negligently designed with an inadequate handrail. Relying in part on *Stewart, supra*, 55 Cal.2d 857, and *Hale v. Depaoli, supra*, 33 Cal.3d 228, the court said: "Under the existing status of the law, an architect who plans and supervises construction work, as an independent contractor, is under a duty to exercise ordinary care in the course thereof for the protection of any person who foreseeably and with reasonable certainty may be injured by his failure to do so, even though such injury may occur after his work has been accepted by the person engaging his services." (*Montijo*, at p. 353.) Similarly, in *Mallow v. Tucker, Sadler & Bennett* (1966) 245 Cal.App.2d 700, the court upheld an architect's liability to a construction worker where the architect's plans negligently failed to

8

indicate the location of underground high-voltage transmission lines, resulting in the worker's electrocution.  (*Id.* at pp. 702–703.)

Architect liability to third parties has not been confined to personal injury; it also extends to property damage.  The Court of Appeal in *Cooper v. Jevne* (1976) 56 Cal.App.3d 860, perhaps the case most similar to the one before us, recognized such liability to condominium purchasers where an architectural firm "prepared and furnished to the builder-seller . . . architectural drawings and plans and specifications for the construction and other improvements within the . . . project and acted as supervising architects in the construction of the buildings within the project."  (*Id.* at p. 867.)  Applying the *Biakanja* factors, *Cooper* held on demurrer that "the architects' duty of reasonable care in the performance of their professional services is logically owed to those who purchased the allegedly defectively designed and built condominiums . . . .  The architects must have known that the condominiums they designed and whose construction they supervised were built by [the builder-seller] for sale to the public and that purchasers of these condominiums would be the ones who would suffer economically, if not bodily, from any negligence by the architects in the performance of their professional services."  (*Id.* at p. 869.)

Similarly, in *Huang v. Garner* (1984) 157 Cal.App.3d 404, the Court of Appeal overturned a nonsuit in an action by a property owner against a building designer and civil engineer for defective design, including insufficient fire retardation walls, that violated building code standards.  (*Id.* at pp. 411–415.)  The court took as a given that design professionals could be held liable to third parties for defective designs causing property damage and economic loss; the only issue was whether negligence had to be proven by expert testimony or could be established by showing departure from then Uniform Building Code requirements as negligence per se.  (*Id.* at pp. 411–414.)  In *Huber, Hunt Nichols, Inc. v. Moore*

9

(1977) 67 Cal.App.3d 278, the court said it is "now well settled that . . . the architect may be sued for negligence in the preparations of plans and specifications either by his client or by third persons . . . ." (*Id.* at p. 299.)

**B.**

The Association argues that the general principle that an architect may be sued in negligence by a future homeowner absent privity is also recognized by statute. The Right to Repair Act establishes a set of building standards for new residential construction and provides that builders and other entities "shall . . . be liable for" violation of those standards "[i]n any action seeking recovery of damages arising out of" such construction. (Civ. Code, § 896; see also *id.*, § 936; all subsequent statutory references are to this code.) Section 896 states that the deficiencies for which builders and other entities are liable include "the residential construction, design, specifications, surveying, planning, supervision, testing, or observation of construction" of a dwelling unit. The Association points to section 936, which provides in part: "Each and every provision of the other chapters of this title apply to general contractors, subcontractors, material suppliers, individual product manufacturers, and *design professionals* to the extent that the general contractors, subcontractors, material suppliers, individual product manufacturers, and *design professionals* caused, in whole or in part, a violation of a particular standard as the result of a negligent act or omission or a breach of contract. In addition to the affirmative defenses set forth in Section 945.5, a general contractor, subcontractor, material supplier, *design professional*, individual product manufacturer, or other entity may also offer common law and contractual defenses as applicable to any claimed violation of a standard." (Italics added.) Section 937 makes clear that the term "design professionals" includes "architects and architecture firms."

10

The Court of Appeal, relying on legislative history, concluded that the Right to Repair Act is "dispositive of the scope of duty" owed by defendants to the homeowners in this case. Defendants make several arguments against this position. First, they observe that whereas the act applies to "new residential units," the residential units in the Project were initially rented as apartments. Second, defendants contend that even if the Right to Repair Act applies to this case, it does not support imposing a duty of care toward the Association's members greater than the duty imposed at common law. Highlighting the portion of section 936 that preserves "common law . . . defenses," defendants argue that that under common law principles of duty articulated by this court, a design professional owes no duty of care to homeowners in the circumstances of this case. Defendants further rely on the established principle that "[a] statute will be construed in light of common law decisions, unless its language ' "clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning a particular subject matter . . . ." ' " (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297.) According to defendants, the Legislature's limited purpose in enacting the Right to Repair Act in 2002 was to abrogate the "economic loss rule" affirmed in *Aas*, *supra*, 24 Cal.4th 627, 636 (see *Greystone Homes, Inc. v. Midtec, Inc.* (2008) 168 Cal.App.4th 1194, 1202 (*Greystone*)), not to otherwise create new tort duties.

We need not decide whether the Right to Repair Act is itself dispositive of the issue before us. Assuming defendants are correct that the existence of a common law duty of care is required to maintain a negligence action under the statute, such a duty exists under the facts alleged here. This conclusion follows from an application of *Biakanja* and *Bily*, as we now explain.

11

**III.**

As noted, *Biakanja* set forth a list of factors that inform whether a duty of care exists between a plaintiff and defendant in the absence of privity: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Although the application of these factors necessarily depends on the circumstances of each case, it is possible to derive general rules that govern common scenarios. An example is our decision in *Bily* limiting the duty of care owed by auditing firms to nonclient third parties. We begin here with a review of *Bily*, whose reasoning provides a useful point of comparison. We then discuss the key considerations that counsel in favor of recognizing a duty of care that design professionals owe to future homeowners in circumstances like those alleged in plaintiff's complaint.

**A.**

*Bily* involved a suit brought by investors in a computer company against the accounting firm that the company had hired to conduct an audit and issue audit reports and financial statements. The plaintiffs claimed that the accounting firm, Arthur Young & Company, had committed negligence in conducting the audit and reporting a $69,000 operating profit rather than the company's actual loss of more than $3 million. The computer company eventually filed for bankruptcy, and its investors lost money. They sued, claiming injury from reliance on Arthur Young's allegedly negligent audit. (*Bily*, *supra*, 3 Cal.4th at pp. 377–379.)

We held that an auditor generally owes no duty of care to its client's investors. (*Bily*, *supra*, 3 Cal.4th at p. 407.) In so holding, we recognized the important " ' "public watchdog" function' " of auditors (*id.* at p. 383) but sought

12

to set a reasonable limit on their potential liability for professional negligence given the vast range of foreseeable third party users of audit reports. "Viewing the problem . . . in light of the [*Biakanja*] factors," the court in *Bily* focused on "three central concerns." (*Id.* at p. 398.)

First, "[g]iven the secondary 'watchdog' role of the auditor, the complexity of the professional opinions rendered in audit reports, and the difficult and potentially tenuous causal relationships between audit reports and economic losses from investment and credit decisions, the auditor exposed to negligence claims from all foreseeable third parties faces potential liability far out of proportion to its fault . . . ." (*Bily*, *supra*, 3 Cal.4th at p. 398.) In elaborating on this concern, the court observed that "audits are performed in a client-controlled environment." (*Id.* at p. 399.) The client "necessarily furnishes the information base for the audit," "has interests in the audit that may not be consonant with those of the public," and "predominates in the dissemination of the audit report." (*Id.* at pp. 399–400.) "Thus, regardless of the efforts of the auditor, the client retains effective primary control of the financial reporting process." (*Id.* at p. 400.)

In addition, the court noted a mismatch between the auditor's "secondary" role in the financial reporting process and the "primary" role attributed to the auditor as the cause of economic loss in a negligence suit by a third party. (*Bily*, *supra*, 3 Cal.4th at p. 400.) Because "the auditor may never have been aware of the existence, let alone the nature or scope, of the third party transaction that resulted in the claim" (*ibid.*), and because "the ultimate decision to lend or invest is often based on numerous business factors that have little to do with the audit report," the auditor's conduct lacks a sufficiently " 'close connection' " to the loss of loaned or invested funds to justify recognition of a duty of care to third parties (*id.* at p. 401). In this context, "the spectre of multibillion-dollar professional liability . . . is distinctly out of proportion to: (1) the fault of the auditor . . . ; and

13

(2) the connection between the auditor's conduct and the third party's injury . . . ." (*Bily*, at p. 402.)

Second, *Bily* emphasized that unlike ordinary consumers in product liability cases, "the generally more sophisticated class of plaintiffs in auditor liability cases (e.g., business lenders and investors) permits the effective use of contract rather than tort liability to control and adjust the relevant risks through 'private ordering' . . . ." (*Bily*, *supra*, 3 Cal.4th at p. 398.) "For example, a third party might expend its own resources to verify the client's financial statements or selected portions of them that were particularly material to its transaction with the client. Or it might commission its own audit or investigation, thus establishing privity between itself and an auditor or investigator to whom it could look for protection. In addition, it might bargain with the client for special security or improved terms in a credit or investment transaction. Finally, the third party could . . . insist[] that an audit be conducted on its behalf or establish[] direct communications with the auditor with respect to its transaction with the client." (*Id.* at p. 403.) "As a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools. This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources. If, instead, third parties are simply permitted to recover from the auditor for mistakes in the client's financial statements, the auditor becomes, in effect, an insurer of not only the financial statements, but of bad loans and investments in general." (*Ibid.*)

Third, *Bily* expressed skepticism that exposing auditors to third party negligence suits would improve the quality of the audits. (*Bily*, *supra*, 3 Cal.4th at pp. 404–405.) "In view of the inherent dependence of the auditor on the client and the labor-intensive nature of auditing, we doubt whether audits can be done in ways that would yield significantly greater accuracy without disadvantages.

14

[Citation.] Auditors may rationally respond to increased liability by simply reducing audit services in fledgling industries where the business failure rate is high, reasoning that they will inevitably be singled out and sued when their client goes into bankruptcy regardless of the care or detail of their audits." (*Id.* at p. 404.)

Notably, *Bily* did not categorically hold that auditors never owe a duty of care to third parties. Instead, *Bily* limited the duty to a "narrow class of persons who, although not clients, may reasonably come to receive and rely on an audit report and whose existence constitutes a risk of audit reporting that may fairly be imposed on the auditor. Such persons are specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report." (*Bily*, *supra*, 3 Cal.4th at pp. 406–407.) In situations where an auditor "clearly intended to undertake the responsibility of influencing particular business transactions involving third persons" with "sufficiently specific economic parameters to permit the [auditor] to assess the risk of moving forward," liability for negligent misrepresentation may extend to persons "to whom or for whom the misrepresentations are made" so long as those persons have actually and justifiably relied on the auditor's report. (*Id.* at pp. 408–409.)

## B.

In many ways, the circumstances of the present case stand in contrast to the concerns in *Bily* that counseled against general recognition of an auditor's duty of care to third parties. Here we focus on three considerations that drive the analysis and distinguish this case from *Bily*: (1) the closeness of the connection between defendants' conduct and plaintiff's injury; (2) the limited and wholly evident class of persons and transactions that defendants' conduct was intended to affect; and (3) the absence of private ordering options that would more efficiently protect homeowners from design defects and their resulting harms. We then summarize

15

this analysis in terms of the *Biakanja* factors, and we distinguish *Weseloh*, *supra*, 125 Cal.App.4th 152, the principal case on which defendants rely. As explained below, we hold that an architect owes a duty of care to future homeowners where the architect is a *principal architect* on the project — that is, the architect, in providing professional design services, is not subordinate to any other design professional — even if the architect does not actually build the project or exercise ultimate control over construction decisions.

### 1.

First, unlike the secondary role played by the auditor in the financial reporting process, defendants' primary role in the design of the Project bears a " 'close connection' " to the injury alleged by plaintiff. (*Bily*, *supra*, 3 Cal.4th at p. 401.) According to the complaint, defendants were the only architects on the Project. In that capacity, defendants "reviewed and approved the course of action where the specifications for the exterior windows . . . were changed to a design that inadequately prevented heat gain, which causes a seriously defective and nonfunctional condition that is also unhealthy." Defendants also "recommended that the number of Z ducts [ventilation ducts] be reduced by a significant quantity, which is a major factor in the nonfunctional, unhealthy condition [of] the interior of the units." The complaint alleges that these professional judgments were negligent and rendered the residential units unsafe and uninhabitable during certain periods of the year. Compared to "the connection between the auditor's conduct and the third party's injury (which will often be attenuated by unrelated business factors that underlie investment and credit decisions)" (*Bily*, at p. 402), the connection between defendants' unique role as the design professionals on the Project and plaintiff's damages resulting from negligent design is far more direct and immediate.

16

The trial court assigned dispositive significance to the fact that defendants did not go "beyond the typical role of an architect, which is to make recommendations to the owner," and that "the final decision rested with the owner." Similarly, defendants contend that "they had no role in the actual construction. Instead, the developer, contractors, and subcontractors retained primary control over the construction process, as well as final say on how the plans were implemented."

However, even if an architect does not actually build the project or make final decisions on construction, a property owner typically employs an architect in order to rely on the architect's specialized training, technical expertise, and professional judgment. The Business and Professions Code defines "[t]he practice of architecture" as "offering or performing, or being in responsible control of, professional services which require the skills of an architect in the planning of sites, and the design, in whole or in part, of buildings, or groups of buildings and structures." (Bus. & Prof. Code, § 5500.1, subd. (a); see *id.*, § 5500.1, subd. (b) [providing a nonexhaustive list of "[a]rchitects' professional services"].) The profession is licensed and regulated by the California Architects Board (*id.*, §§ 5510, 5510.1, 5510.15, 5526), and the unlicensed or unauthorized practice of architecture is punishable as a misdemeanor (*id.*, §§ 5536, 5536.1). In order to practice architecture, an applicant must pass two specialized exams, must demonstrate eight years of training and educational experience in architectural work, and must complete an internship program. (*Id.*, §§ 5550, 5551, 5552, subd. (a); Cal. Code Regs., tit. 16, §§ 116–117.)

In this case, defendants were the principal architects on the Project. Among all the entities involved in the Project, defendants uniquely possessed architectural expertise. There is no suggestion that the owner or anyone else had special competence or exercised professional judgment on architectural issues such as

17

adequate ventilation or code-compliant windows.  Just as a lawyer cannot escape negligence liability to clearly intended third party beneficiaries on the ground that the client has the ultimate authority to follow or reject the lawyer's advice (see, e.g., *Heyer v. Flaig* (1969) 70 Cal.2d 223, 226; *Lucas v. Hamm* (1961) 56 Cal.2d 583, 588), so too an architect cannot escape such liability on the ground that the client makes the final decisions.  An architect providing professional design services to a developer does not operate in a "client-controlled environment" comparable to the relationship between an auditor and its client.  (*Bily*, *supra*, 3 Cal.4th at p. 399.)  Whereas an auditor's "client, of course, has interests in the audit that may not be consonant with those of the public" (*ibid.*), it would be patently inconsistent with public policy to hold that an architect's failure to exercise due care in designing a building can be justified by client interests at odds with the interest of prospective homeowners in safety and habitability.

Were there any doubt as to defendants' principal role in the design of the Project, it is dispelled by additional facts alleged here.  According to the complaint, defendants not only provided design services at the outset of the Project but also brought their expertise to bear on the implementation of their plans and specifications by doing weekly inspections at the construction site, monitoring contractor compliance with design plans, altering design requirements as issues arose, and advising the owner of any nonconforming work that should be rejected — all for a fee of more than $5 million.  In other words, defendants applied their specialized skill and professional judgment throughout the construction process to ensure that it would proceed according to approved designs.  The work defendants performed does not resemble "a broadly phrased professional opinion based on a necessarily confined examination" of client-provided information (*Bily*, *supra*, 3 Cal.4th at p. 403), nor did defendants act merely as "suppliers of information and evaluations for the use and benefit of

18

others" (*id.* at p. 410). Instead, defendants played a lead role not only in designing the Project but also in implementing the Project design.

Nor do we find persuasive defendants' claim that the connection between their conduct and plaintiff's injury is "attenuated because . . . when the developer sold the units two years after construction, it was aware of, and concealed, the alleged defects." This specific allegation, if true, may inform whether defendants' conduct was the proximate cause of plaintiff's injury. (See, e.g., *Gonzalez v. Derrington* (1961) 56 Cal.2d 130, 134 ["independent, intervening cause" may preclude finding of proximate cause]; 6 Witkin, Summary of Cal. Law, Torts (10th ed. 2005) § 1214, pp. 590–591.) It also may give rise to a claim of equitable indemnity by defendants against the developer. (See *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1197–1198; *Greystone*, *supra*, 168 Cal.App.4th at p. 1208.) There is no reason to think in this case or in general that the developer and other major players have "left the scene" via bankruptcy, as is often the case with auditor liability suits. (*Bily*, *supra*, 3 Cal.4th at p. 400.) But because the developer's alleged misdeeds are themselves derivative of defendants' allegedly negligent conduct, they do not diminish the closeness of the connection between defendants' conduct and plaintiff's injury for purposes of determining the existence of a duty of care.

## 2.

Second, recognizing that an architect who is a principal provider of professional design services on a residential building project owes a duty of care to future homeowners does not raise the prospect of " 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.' " (*Bily*, *supra*, 3 Cal.4th at p. 385, quoting *Ultramares Corp. v. Touche* (N.Y. 1931) 174 N.E. 441, 444.) As the complaint here alleges, defendants engaged in work on the Project with the knowledge that the finished construction would be sold as condominiums

19

and used as residences.  There was no uncertainty, as there was in *Bily*, as to "the existence, let alone the nature or scope, of the third party transaction that resulted in the claim."  (*Bily*, *supra*, 3 Cal.4th at p. 400.)  Defendants' work on the Project "was intended to affect the plaintiff," and "the 'end and aim' of the transaction was to provide" safe and habitable residences for future homeowners, a specific, foreseeable, and well-defined class.  (*Biakanja*, *supra*, 49 Cal.2d at p. 650.)  There is no "spectre of vast numbers of suits and limitless financial exposure" in this case.  (*Bily*, at p. 400.)  Instead, defendants "clearly intended to undertake the responsibility of influencing particular business transactions [i.e., condominium purchases] involving third persons [i.e., prospective homeowners]" (*id.* at p. 408) and could therefore "ascertain the potential scope of its liability and make rational decisions regarding the undertaking" (*id.* at p. 409).  Further, as noted, defendants can limit their liability in proportion to fault through an action for equitable indemnification.

Defendants point to a provision in the contract with the developer that expressly disclaims the existence of any "third-party beneficiary of the obligations contained in the Agreement."  But we have never held that third party beneficiary status is a prerequisite to alleging negligence.  In *Bily*, we noted only that third party beneficiaries "may under appropriate circumstances possess the rights of parties to the contract" (*Bily*, *supra*, 3 Cal.4th at p. 406, fn. 16), not that the lack of such status precludes liability in tort.  If anything, the contract provision on which defendants rely "only serves to emphasize the fact that [defendants] were more than well aware that future homeowners would necessarily be affected by the work that they performed," as the Court of Appeal observed.

### 3.

Third, the prospect of private ordering as an alternative to negligence liability is far less compelling here than in *Bily*.  Whereas "[i]nvestors, creditors,

20

and others who read and rely on audit reports and financial statements are not the equivalent of ordinary consumers" because "they often possess considerable sophistication in analyzing financial information and are aware from training and experience of the limits of an audit report 'product,' " the average homebuyer is more akin to "the 'presumptively powerless consumer' in product liability cases." (*Bily*, *supra*, 3 Cal.4th at p. 403.) The typical homebuyer " 'clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible.' " (*Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 228 (*Kriegler*).) As Chief Justice Traynor said for the court in *Connor v. Great Western Savings & Loan Assn.* (1968) 69 Cal.2d 850, "the usual buyer of a home is ill-equipped with experience or financial means to discern . . . structural defects. [Citation.] Moreover a home is not only a major investment for the usual buyer but also the only shelter he has. Hence it becomes doubly important to protect him against structural defects that could prove beyond his capacity to remedy." (*Id.* at p. 867.)

Defendants contend that plaintiff has options for redress within the bounds of privity: Plaintiff may seek an assignment of the developer's rights against defendants, or plaintiff may pursue its design defect claims against the developer, and the developer may in turn seek redress from defendants. But it is questionable whether this more attenuated form of liability will consistently provide adequate redress. More importantly, the chief interest of prospective homeowners is to avoid purchasing a defective home, not only to have adequate redress after the

21

fact. The long-established common law rule holding architects as independent professionals directly accountable to third party homeowners is most likely to vindicate that interest.

Moreover, as we recognized in *Bily*, the sophisticated consumer of audit reports "might expend its own resources to verify the client's financial statements or selected portions of them that were particularly material to its transaction with the client. Or it might commission its own audit or investigation, thus establishing privity between itself and an auditor or investigator to whom it could look for protection." (*Bily*, *supra*, 3 Cal.4th at p. 403.) But it is unrealistic to expect homebuyers to take comparable measures. A liability rule that places the onus on homebuyers to employ their own architects to fully investigate the structure and design of each home they might be interested in purchasing does not seem more efficient than a rule that makes the architects who designed the homes directly responsible to homebuyers for exercising due care in the first place. This seems especially true in "today's society" given the "mass production and sale of homes" (*Kriegler, supra,* 269 Cal.App.2d at p. 227), such as the 595-unit condominium project in this case.

**4.**

For the reasons above, we conclude that the allegations in the complaint are sufficient, if proven, to establish that defendants owed a duty of care to the homeowners who constitute the Association. Our conclusion, which coheres with a substantial body of case law (*ante*, at pp. 5–10), may be summarized in terms of the *Biakanja* factors: (1) Defendants' work was intended to benefit the homeowners living in the residential units that defendants designed and helped to construct. (2) It was foreseeable that these homeowners would be among the limited class of persons harmed by the negligently designed units. (3) Plaintiff's members have suffered injury; the design defects have made their homes unsafe

22

and uninhabitable during certain periods. (4) In light of the nature and extent of defendants' role as the sole architects on the Project, there is a close connection between defendants' conduct and the injury suffered. (5) Because of defendants' unique and well-compensated role in the Project as well as their awareness that future homeowners would rely on their specialized expertise in designing safe and habitable homes, significant moral blame attaches to defendants' conduct. (6) The policy of preventing future harm to homeowners reliant on architects' specialized skills supports recognition of a duty of care. Options for private ordering are often unrealistic for typical homeowners, and no reason appears to favor homeowners as opposed to architects as efficient distributors of loss resulting from negligent design.

Defendants contend that the balance of *Biakanja* factors is no different in this case than in *Weseloh*, *supra*, 125 Cal.App.4th 152, where the court found no duty of care owed by a design engineer to the third party owner of commercial property. But the defendants in *Weseloh* played a materially different role in the construction project than defendants did here.

In *Weseloh*, a property owner (Weseloh) contracted with a general contractor (Wessel) to build an automobile dealership on the property. A subcontractor, Sierra Pacific Earth Retention Corporation (Sierra), built the retaining walls for the project. Sierra, in turn, enlisted Charles Randle, an employee of Owen Engineering Company (Owen), to design two retaining walls for a fee of $1,500 or $2,200. Neither Randle nor Owen had a contractual relationship with Weseloh, and neither supervised the construction of the retaining walls. At Sierra's request, Randle and Owen inspected the retaining walls after construction. When a portion of the retaining walls failed, resulting in $6 million of property damage, Weseloh sued Wessel, Sierra, and Randle and Owen. Weseloh entered into a settlement agreement with Wessel and Sierra, but the suits

23

against Randle and Owen went forward. On summary judgment, the trial court concluded that Randle and Owen owed no duty to Weseloh, and the Court of Appeal affirmed. (See *Weseloh*, *supra*, 125 Cal.App.4th at pp. 158–162.)

As suggested by the size of their fee, the defendants in *Weseloh* had a limited role in the construction project. The "undisputed evidence" showed that "neither Randle nor Owen had a 'role in the construction' of the retaining walls." (*Weseloh*, *supra*, 125 Cal.App.4th at p. 164.) In addition, although "Randle was aware the property was owned by Weseloh," the Court of Appeal found it significant that Randle and Owen provided their services to Sierra, another engineering firm. As the court observed, "the earth retention calculations prepared for Wessel . . . identified the preparer as [Sierra], not Randle or Owen. This evidence bolsters the position that Randle and Owen's role in the project was to primarily benefit Sierra as the preparer of the calculations. To the extent Randle and Owen's participation in the project would also benefit Wessel and the Weseloh plaintiffs, it was only through Sierra." (*Id.* at p. 167; see *id.* at p. 171, fn. 5 [noting that Sierra paid $1.2 million of the alleged $6 million liability under the settlement agreement].)

The circumstances in this case are plainly different. Unlike Randle and Owen, whose work informed their client's own exercise of technical expertise in preparing earth retention calculations, defendants here were the sole entities providing architectural services to the Project. They did not provide their specialized services to a client or other entity that in turn applied its own architectural expertise to the plans and specifications supplied by defendants. Moreover, defendants not only applied their expertise to designing the Project but further applied their expertise to ensure that construction would conform to approved designs. *Weseloh*, which expressly limited its holding to its facts (*Weseloh*, *supra*, 125 Cal.App.4th at p. 173), does not stand for the broad

24

proposition that a design professional cannot be liable in negligence to third parties so long as it renders "professional advice and opinion" (*id.* at p. 169) without having ultimate decisionmaking authority. Instead, *Weseloh* merely suggests that an architect's role in a project can be so minor and so subordinate to the role or judgment of other design professionals as to foreclose the architect's liability in negligence to third parties.

Moreover, the *Weseloh* court, reviewing the case at the summary judgment stage, concluded that the plaintiffs had "failed to produce evidence showing how and the extent to which their damages were caused by the asserted design defects." (*Weseloh*, *supra*, 125 Cal.App.4th at p. 168.) The court also noted the absence of evidence that "Sierra actually used Randle and Owen's design without alteration in constructing the retaining walls." (*Ibid.*) These observations regarding lack of causation not only informed *Weseloh*'s duty analysis (see *id.* at pp. 168–169) but also provided an independent basis for granting summary judgment in the defendants' favor. In the present case, which is before us on demurrer, no similar causation problem confronts us. According to the complaint, defendants approved the use of defective windows and designed a defective ventilation system, all of which created conditions that made the homes uninhabitable for portions of the year. The complaint sufficiently alleges the causal link between defendants' negligence and plaintiff's injury that was lacking in *Weseloh*.

## IV.

For the reasons above, we conclude that the trial court erred in sustaining defendants' demurrer on the ground that they owed no duty of care to the

25

Association's members.  Because the Court of Appeal correctly reversed the trial court's judgment, we affirm the Court of Appeal's judgment.


LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
                          BAXTER, J.
                          WERDEGAR, J.
                          CHIN, J.
                          CORRIGAN, J.
                          RICHMAN, J.*

---

\*        Associate Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Beacon Residential Community Association v. Skidmore, Owings & Merrill LLP
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 211 Cal.App.4th 1301
**Rehearing Granted**

_____

**Opinion No.** S208173
**Date Filed:** July 3, 2014
_____

**Court:** Superior
**County:** San Francisco
**Judge:** Richard A. Kramer

_____

**Counsel:**

Law Offices of Ann Rankin, Ann Rankin, Terry L. Wilkens; Katzoff & Riggs, Kenneth S. Katzoff, Robert R. Riggs, Sung E. Shim and Stephen G. Preonas for Plaintiff and Appellant.

Berding & Weil and Matt J. Malone for Consumer Attorneys of California and Executive Council of Homeowners as Amici Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Peder K. Batalden and Peter Abrahams for Defendants and Respondents Skidmore, Owings & Merrill LLP, and HKS, Inc.

Robles, Castles & Meredith and Richard C. Young for Defendant and Respondent Skidmore, Owings & Merrill LLP.

Schwartz & Janzen, Noel E. Macaulay and Steven H. Schwartz for Defendant and Respondent HKS, Inc.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Shannon B. Jones Law Group, Kathleen F. Carpenter, Jessica M. Takano and Amy R. Gowan for California Building Industry Association as Amicus Curiae on behalf of Defendants and Respondents.

Collins Collins Muir + Stewart, David E. Barker and Melinda W. Ebelhar for The American Institute of Architects California Council and The American Institute of Architects as Amici Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert R. Riggs
Katzoff & Riggs
1500 Park Avenue, Suite 300
Emeryville, CA  94608
(510) 597-1990

Peter Abrahams
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA  91436-3000
(818) 995-0800