Filed 11/16/16; pub. order 12/9/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TAGHI ALEREZA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CHICAGO TITLE COMPANY,<br><br>Defendant and Respondent. | C075547<br><br>(Super. Ct. No. 34201000072856CUBCGDS) |

The sole issue in this appeal arises in the context of the sale of a gas station business and whether escrow company Chicago Title Company (Chicago Title) owed a legal duty of care to Taghi Alereza, who was not a party to the escrow nor mentioned as a third party beneficiary in the escrow instructions. Chicago Title admitted its employee negligently listed the wrong name of the insured (the purchaser of the gas station business) when securing a new certificate of insurance for the business. This was the first of a series of missteps by several persons that eventually led to Alereza giving a personal guarantee to save the gas station business. Claiming damages for losses incurred after

1

giving his personal guarantee, Alereza sued Chicago Title. The trial court granted Chicago Title's motion for nonsuit, and Alereza appeals.

Focusing only on his negligence cause of action, Alereza argues he was owed a duty of care by Chicago Title under the test articulated by the California Supreme Court in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*). We conclude Chicago Title did not owe a duty of care to Alereza because he was not a party to the escrow, not mentioned in the escrow instructions as a third party beneficiary, and did not sustain his losses as a direct result of the escrow company's negligence. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

The facts pertaining to Alereza's claim of negligence against Chicago Title are undisputed.

In early 2008, Alereza agreed to help his nephew Habib[1] (Bobby) purchase a business consisting of a gas station and convenience store in Sacramento. They planned to have Bobby run the business. Alereza's role involved nothing more than providing the initial purchase funds and a $100,000 note secured by his residence. Bobby's observations and an analysis of the gas station's profit and loss statements led him to conclude the business had "a high-volume store, a lot of foot traffic, and a lot of gas sales." The gas station building and land underneath it were owned by John and Jackie Fagnani. Bains Brothers LLC (Bains) ran the gas station business and had a lease with the Fagnanis. It was the Bains's business that Bobby wanted to purchase.

---

[1] Since plaintiff and his nephew share the same last name, we refer to plaintiff as Alereza and his nephew as "Bobby" for clarity.

2

### Escrow 1

To facilitate the sale of the gas station business, an escrow was opened with Chicago Title. Nancy Pearson was the escrow officer at Chicago Title who handled the transaction.

Alereza initially planned that he and his wife would purchase the gas station as individuals. However, he decided against this plan after the Fagnanis demanded a personal guarantee from him in order to transfer the lease. At the suggestion of his attorney, Alereza formed a limited liability company, TANL, LLC (TANL), to purchase the gas station business. The escrow instructions were amended to change the buyer from Alereza and his wife to TANL. However, the Fagnanis refused to approve of the change in tenants without a new personal guarantee. As a result, the first escrow was cancelled.

### Escrow 2

One of the members of Bains suggested a solution to the Fagnani's demand for a new personal guarantee. The suggestion was that, rather than buying the gas station business outright, TANL would buy the membership interest in Bains and Bains would remain the tenant on the lease. The idea was to keep Bains as the tenant and there would be no lease transfer subject to approval by the Fagnanis. Thus Alereza would avoid giving a personal guarantee. To implement the new plan, Chicago Title transferred the Escrow 1 documents to Escrow 2.

While the transaction was pending, the Fagnanis learned of what they considered to be an "end run" around the requirement that they approve any transfer of the lease. The Fagnanis declared they would consider any change in the ownership of Bains without their approval to be a breach of the lease. Nonetheless, Escrow 2 closed with Bains remaining the tenant on the lease, without approval by the Fagnanis, and without Alereza giving a personal guarantee.

Under the terms of the lease, the tenant was required to maintain business insurance that included the Fagnanis as additional insured. To satisfy this requirement, Alereza decided to retain insurance from the same company that had provided coverage for the previous owners of Bains. Alereza gave Pearson the insurance contact information and assumed she would take care of the insurance and pay the premium through escrow. As part of Escrow 1, Pearson obtained insurance certificates showing the insured to be TANL. For Escrow 2, however, the insurance certificate should have been under the name of Bains. No one informed the insurer when Escrow 1 was cancelled or when Escrow 2 was opened. At the close of Escrow 2, Pearson requested that the insurer provide evidence of insurance and incorrectly stated the insurance should vest with "Tanl, LLC, a California limited liability company (doing business as Bains Brothers, LLC)." The parties agree this information was incorrect. The parties also agree Pearson sent a superseded bill of sale from Escrow 1 that incorrectly showed the business being transferred to TANL.

### Alereza Decided to Give a Personal Guarantee

The insurer issued a new certificate in the name of "Tanl, LLC, a Limited Liab. Co. dba Bains Brothers LLC" and cancelled insurance previously issued to "Bains Brothers LLC." The insurer did not send the new certificate of insurance to Alereza. During the period when insurance coverage became an issue, Alereza, the Fagnanis, and the insurer were not communicating with each other. The insurer communicated only with Bobby based on the mistaken assumption he was their contact person. Bobby wrongly assumed Alereza was informed of the insurance issue and would take care of it. The insurer was not initially aware there was any problem with the insurance certificate. And the Fagnanis had not been included in the discussions about insurance coverage.

When the insurer sent a notice of cancellation of the original policy, the Fagnanis became concerned the gas station was operating without insurance. In May 2009, the

4

Fagnanis gave Alereza a 10-day period in which to secure insurance, provide a personal guarantee, and pay their attorney fees. When the personal guarantee was not forthcoming, the Fagnanis filed an unlawful detainer action. The unlawful detainer action ended with a settlement agreement in which Alereza agreed, among other things, to give a personal guarantee under the lease in exchange for dismissal of the Fagnani's legal action. At the time, business at the gas station was satisfactory.

A year later, gasoline sales slumped by 40 percent due to the slowing economy and loss of a major state account, and the gas station began losing approximately $10,000 to $12,000 per month. Alereza testified he paid and borrowed more than $400,000 to keep the gas station business from defaulting on the lease.

### Alereza's Action Against Chicago Title

Alereza (joined by TANL and Bains) sued Chicago Title and Pearson based on the incorrect identification of the insured on the insurance certificate that eventually led to the demand for a personal guarantee by the Fagnanis. The complaint alleged causes of action for breach of contract, negligence, breach of fiduciary duty, implied contractual indemnity, and implied equitable indemnity. After Pearson, Bains, and TANL were dismissed, the case proceeded to trial against Chicago Title. Chicago Title moved for nonsuit at the close of Alereza's case. The trial court continued to receive evidence while the parties briefed the nonsuit motion. The trial court granted the motion for nonsuit as to all causes of action and entered judgment in favor of Chicago Title.

In granting the motion, the trial court noted that "[t]he negligence of C[hicago Title] in relation to the incorrect name and communications regarding insurance to an insurance broker are not in dispute. C[hicago Title] has admitted for purposes of this motion and at trial that its employee was negligent." Because there was no contractual relationship between Chicago Title and Alereza, his entitlement to damages depended on whether he could establish a tort cause of action. The trial court determined Chicago Title did not owe a duty of care to Alereza because "the escrow contract for Escrow 2 did

5

not mention, relate or refer to Alereza in his personal capacity." The trial court also found that "the injury Alereza has alleged as an individual against C[hicago Title] was not foreseeable as a result of a professional error by C[hicago Title] in performing the escrow services in Escrow 2, even if all the potential ramifications of the insurance placement and volatility of the Fagnanis lease were known to C[hicago Title] at the time."

From the judgment, Alereza filed a timely notice of appeal.

DISCUSSION

I

*Standard of Review*

The principles of review for a judgment entered on a motion for nonsuit are well established. " 'A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor. [Citations.]' (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583.) Nonsuit is appropriate where the plaintiff's proof raises nothing more than speculation, suspicion or conjecture. (*Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194, 198, fn. 1.) [¶] In reviewing a grant of nonsuit, the appellate court evaluates the evidence in the light most favorable to the plaintiff. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) The judgment of nonsuit will be affirmed if a judgment for the defendant is required as a matter of law, after resolving all presumptions, inferences and doubts in favor of the plaintiff. (*Ibid.*) The review of a grant of nonsuit is de novo. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542.)" (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 669.)

## II

### *Whether Chicago Title Owed a Duty of Care to Alereza*

Alereza contends Chicago Title owed him a duty of care that it breached when its escrow officer negligently miscommunicated the name of the insured (the purchaser of the gas station business) to the insurer.  We conclude Chicago Title did not owe a duty of care to Alereza and therefore is not liable to him for its negligence.

### A.

### *The Biakanja Test for Tort Liability*

The three elements for a cause of action for negligence are:  a legal duty of care, breach of the duty, and damages resulting from the breach.  (*Paz v. State of California* (2000) 22 Cal.4th 550, 559.)  "The existence of a duty is the threshold element of a negligence cause of action.  (*Paz v. State of California, supra*, 22 Cal.4th at p. 559; *Artiglio v. Corning Inc., supra*, 18 Cal.4th at p. 614.)  The Supreme Court has held, ' " 'The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion.  [Citations.]' " ' (*Paz v. State of California, supra*, 22 Cal.4th at p. 559; see *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co*. (2002) 27 Cal.4th 705, 715.)" (*Friedman v. Merck & Co*. (2003) 107 Cal.App.4th 454, 463.)

The test for determining the existence of a duty of care to a particular person was articulated by the California Supreme Court in *Biakanja*, *supra*, 49 Cal.2d 647.  *Biakanja* involved an action for negligence by the sole beneficiary of a will against a notary public who prepared a will that turned out to be ineffective for lack of proper attestation.  (*Id.* at p. 648.)  The issue before the Supreme Court was whether the notary was "under a duty to exercise due care to protect [sole beneficiary] from injury and was liable for damage caused [to the sole beneficiary] by his negligence even though they were not in privity of contract." (*Ibid.*)

7

In addressing the question of legal duty, the *Biakanja* court noted that "[i]mposition of liability for injuries to intangible interests has been refused . . . in the absence of privity where any potential advantage to the plaintiff from the performance of the contract was only a collateral consideration of the transaction or where the injury to the particular person bringing suit was not foreseeable." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Based on this observation, the California Supreme Court articulated the test for determining the existence of a legal duty as follows: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him [or her], the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Applying this test, the *Biakanja* court held the notary owed the sole beneficiary a duty of care and directly caused injury to the beneficiary. (*Id.* at p. 651.)

The California Supreme Court applied the *Biakanja* test in an action against an escrow company by a person not a party to the escrow in *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705. *Summit* arose out of an escrow to complete the refinancing of real property by John Furnish who intended a portion of a new loan from Dundrel Securities (Dundrel) to pay off the original promissory note held by Talbert Financial. (*Id.* at p. 708.) The escrow company acted according to the escrow instructions by issuing a check to Talbert Financial. (*Ibid.*) Summit Financial Holdings, Ltd. (Summit) then sued the escrow company on grounds the escrow company knew Summit had received the note by assignment and yet the escrow company still paid Talbert Financial. (*Ibid.*) Even though neither Talbert Financial nor Summit was a party to the escrow transaction, the trial court ruled the escrow company

8

owed Summit a duty of care. (*Ibid.*) The California Supreme Court, however, held the escrow company did not owe a duty of care to Summit. (*Ibid.*)

The *Summit* court began its analysis by noting, "An escrow holder is an agent and fiduciary of the parties to the escrow. (*Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 534 (*Amen*); *Rianda v. San Benito Title Guar. Co.* (1950) 35 Cal.2d 170, 173.) The agency created by the escrow is limited -- limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow. [Citations.] If the escrow holder fails to carry out an instruction it has contracted to perform, the injured party has a cause of action for breach of contract." (*Summit*, *supra*, 27 Cal.4th at p. 711.) "Absent clear evidence of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions. (*Lee v. Title Ins. & Trust Co.* (1968) 264 Cal.App.2d 160, 162; 3 Miller & Starr, Cal. Real Estate [(3d ed. 1989)] § 6:26, p. 68.) Here, even though the escrow holder . . . was aware of the assignment from Talbert to Summit, there is no evidence [that the escrow company] was aware of any collusion or fraud in the fund disbursement that would have adversely affected any party to the escrow." (*Summit*, at p. 711.)

Under the *Biakanja* test*, supra,* 49 Cal.2d 647, the *Summit* court concluded the escrow company did not owe a duty of care to Summit. The Supreme Court reasoned, " 'First, the transaction [the escrow company] undertook was not intended to affect or benefit Summit. [The escrow company] was engaged by Dundrel and Furnish to assist them in closing a loan transaction between Dundrel and Furnish, and any impact that transaction may have had on Summit was collateral to the primary purpose of the escrow. Second, although the certainty of injury element is satisfied because the evidence supports the conclusion that Summit did not receive the funds paid to Talbert, the foreseeability of harm element does not support a duty because there is no suggestion [the escrow company] could have foreseen that Talbert would not disburse the funds to Summit.' With regard to the moral blame factor, compliance by [the escrow company]

9

with its fiduciary duty to follow the instructions of the parties to the escrow was not blameworthy and is, instead, a policy consideration that militates against concluding the company had a tort duty in this case. Finally, there is not a sufficiently close connection between the payment of Talbert and the injury suffered by Summit to warrant imposition of a duty of care. Although the payment to Talbert was found by the bankruptcy court to have extinguished Furnish's obligation under the note, Summit's injury was caused by Talbert's breach of its contractual obligation to Summit." (*Summit*, *supra*, 27 Cal.4th at pp. 715-716, fn. omitted.) By rejecting the assertion of a legal duty to a nonparty to the escrow, the *Summit* court "decline[d] to adopt a rule that would, by subjecting an escrow holder to conflicting obligations, undermine a valuable business procedure . . . ." (*Id.* at p. 716.)

## B.

### *Chicago Title Did Not Owe a Duty of Care to Alereza*

Applying the *Biakanja* test in this case (*Biakanja, supra,* 49 Cal.2d 647), we conclude Chicago Title did not owe a duty of care to Alereza.

First, Alereza was not a party to Escrow 2, which involved only the transfer of membership interests in Bains to TANL. Even though Alereza provided the purchase funds and provided a note secured by his residence, the escrow completed a sale that did not involve Alereza personally as buyer or seller. Alereza was not a party to the escrow instructions nor was he a third party beneficiary of the transaction.

We reject Alereza's assertion he benefited from the transaction by the "psychic and emotional reward" of helping his nephew, Bobby, acquire a job. The escrow agreement was not designed to provide emotional satisfaction to Alereza, but only to complete a business transaction between Bains and TANL. Although the transaction was structured in a manner to shield Alereza from giving a personal guarantee, as the trial court found, "Escrow 2 did not mention, relate or refer to Alereza in his personal capacity." At most, the benefit to Alereza was a collateral benefit of the escrow

10

transaction. Thus, the first *Biakanja* factor counsels against a duty of care to Alereza. (*Biakanja, supra,* 49 Cal.2d 647.)

Second, foreseeability of harm also fails to support the imposition of a legal duty to Alereza. At the close of escrow, Alereza had no personal liability for any gas station business losses. His subsequent decision to provide a personal guarantee was not something Chicago Title could reasonably foresee.

Third, the degree of certainty that Alereza suffered harm as a result of Chicago Title's negligence also does not support imposition of a legal duty. As the trial court found, Chicago Title's "mistakes, while negligent, were not potentially fatal, as a correction to the name on the certificates later showed." Instead, it was a cascade of errors by several different individuals that finally led to the claimed damages. Correction of the certificate was delayed because the insurer mistakenly assumed its communications with Bobby sufficed. Bobby ignored the insurance issues on the erroneous assumption Alereza would take care of it. The newly reconstituted Bains did not learn of the problem in a timely manner because it did not promptly change its agent for service of process. Alereza decided to give his personal guarantee as part of a settlement of the unlawful detainer action. He was not personally liable for any part of the gas station business until he decided to give his personal guarantee. Finally, the giving of the personal guarantee itself did not cause Alereza's losses. Instead, the financial losses Alereza sustained were caused by a drop in the monthly gas sales and loss of a major state account.

Fourth, there was only a remote connection between the misidentification of the insured by Pearson and Alereza's eventual financial losses when the gas station business declined. As noted above, several independent errors separated Chicago Title's negligent acts from the ultimate financial losses later claimed by Alereza.

Fifth, Chicago Title's negligence is not morally blameworthy. Although negligent, the mistake in providing the name of the Escrow 1 purchaser of the gas station

11

business to the insurer instead of the Escrow 2 purchaser does not constitute moral blame. We reject Alereza's contention negligence is *inherently* morally blameworthy. Here, the escrow officer did not act fraudulently, illegally, or with any intent to cause anyone disadvantage.

Finally, the policy of preventing future harm does not require imposition of a new legal duty on Chicago Title in this case. Escrow companies already owe a fiduciary duty to parties to an escrow to properly carry out all escrow instructions. (*Summit*, *supra*, 27 Cal.4th at p. 711.) Failure of an escrow company to perform gives parties to the escrow a cause of action for breach of contract for any proximately caused damages. (*Ibid.*) For this reason, escrow companies already have both duties and incentives to faithfully execute the escrow instructions of the parties.

Because escrow companies have obligations limited to carrying out escrow instructions (*Summit*, *supra*, 27 Cal.4th at p. 711), we reject as inapposite Alereza's reliance on *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, *Connor v. Great Western Sav. & Loan Ass'n* (1968) 69 Cal.2d 850, and *Seeley v. Seymour* (1987) 190 Cal.App.3d 844. *Beacon* and *Connor* do not involve the duty of escrow companies. In *Beacon*, the California Supreme Court held architectural firms and developers had a responsibility to homeowners that the homes they built were safe. (*Beacon*, at p. 582.) Similarly, the *Connor* court held a construction lender owed a duty to third party home buyers to prevent major defects in homes financed by the lender because of a lender's unique ability in the development process to ensure quality in construction. (*Connor*, at p. 864.) Although *Seeley* involved a tort claim against an escrow company, the claim was not based on failure to properly carry out escrow instructions. (*Seeley*, at p. 860.) Instead, the escrow company in *Seeley* acted negligently in accommodating its customer by recording a memorandum with the county recorder that eventually made the sales transaction more difficult to complete. (*Id.* at p. 861.)

12

In sum, all of the considerations set forth in the *Biakanja* test for tort liability militate against imposing on Chicago Title a legal duty of care to Alereza.  The trial court therefore properly granted the motion for nonsuit.

DISPOSITION

The judgment is affirmed.  Chicago Title Company shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


          /s/
    HOCH, J.


We concur:


      /s/
HULL, Acting P. J.


      /s/
DUARTE, J.

13

Filed 12/9/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TAGHI ALEREZA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CHICAGO TITLE COMPANY,<br><br>    Defendant and Respondent. | C075547<br><br>(Super. Ct. No. 34201000072856CUBCGDS)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, Judy Holzer-Hersher, Judge.  Affirmed.

LAW OFFICES OF MELINDA JANE STEUER and Melinda Jane Steuer for Plaintiff and Appellant.

FIDELITY NATIONAL LAW GROUP and Helen P. Hoeffel for Defendant and Respondent.

14

The opinion in the above-entitled matter filed on November 16, 2016, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be published in the Official Reports and it is so ordered.


          /s/          
HULL, Acting P. J.


          /s/          
DUARTE, J.


          /s/          
HOCH, J.

15