Filed 2/23/21  Luzuriaga v. R.C. Berger Construction CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| DEBORAH LUZURIAGA, | |
| Plaintiff and Appellant, | E072526 |
| v. | (Super.Ct.No. RIC1602017) |
| R.C. BERGER CONSTRUCTION, INC. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Raquel A. Marquez and

Angel M. Bermudez, Judges.*  Affirmed.

Law Offices of Jonathan C. Stevens and Jonathan C. Stevens for Plaintiff and

Appellant.

---

*        Judge Marquez ruled on the motions for summary judgment/summary adjudication, although Judge Bermudez signed the formal order on those motions.  Judge Bermudez also denied the motion for leave to amend and entered judgment.

1

The Mouzis Law Firm, Gerald W. Mouzis, and Amanda L. Voivedich for Defendants and Respondents R.C. Berger Construction, Inc., Carla Berger, and Ronald Berger.

Richard A. Nervig for Defendant and Respondent Gary Cuellar.

Deborah Luzuriaga sought to construct a veterinary hospital on property that she owned in Wildomar. Mechanic's liens against the property started to mount up, and she came to believe that the general contractor (not a party to this action) had embezzled construction funds. She fired the general contractor and took over management of the project herself. Needless to say, litigation ensued, on several fronts. This is not even the first time that some of that litigation has come before this court. (See *Precision Framing Systems Inc. v. Luzuriaga* (2019) 39 Cal.App.5th 457, 459.)

In this particular action, Luzuriaga sued the grading subcontractor, along with various other individuals and entities that were also involved in the grading. She alleges that the grading was not done in accordance with the plans and specifications. As a result, she had to pay to have it partially redone; moreover, she incurred additional expenses to obtain the release of a mechanic's lien. She also alleges that some of the defendants carried out grading work without being licensed to do so, and that some of the defendants claimed a mechanic's lien without being legally entitled to do so.

The grading subcontractor defaulted. Its owner declared bankruptcy. The trial court granted summary judgment in favor of all the other defendants. It ruled that they were not required to have contractor's licenses. It also ruled that they were not negligent

2

because they did not owe Luzuriaga a duty of care. Finally, it ruled that Luzuriaga had failed to plead her theory that one of the defendants improperly claimed a mechanic's lien because it acted only as a go-between and thus did not provide work for the work of improvement. It denied Luzuriaga's motion for leave to amend to plead this theory.

Luzuriaga appeals. We will uphold the trial court on all points. Hence, we will affirm.

## I

## STATEMENT OF FACTS

We consider all of the evidence set forth in the papers, except evidence to which the trial court sustained an objection. (Code Civ. Proc., § 437c, subd. (c).) Moreover, because the evidence in support of the three motions was generally consistent, and because it appears that the trial court considered all three motions together, we consider the evidence offered in connection with all three motions collectively.

### A. *Grading Work*.

Luzuriaga and her husband own a piece of property in Wildomar. She undertook to develop it as a veterinary hospital.

She hired a general contractor. The contract between them was an American Institute of Architects (AIA) standard form construction contract. It incorporated the plans and specifications. It provided that the contractor must require each subcontractor to be bound by the plans and specifications. It also provided that a subcontractor must require each sub-subcontractor to be bound by the plans and specifications, "[w]here

appropriate." It defined a "sub-subcontractor" as "a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site."

1. *July 2013 grading work.*

In July 2013, the general contractor hired B&T Works, Inc. (B&T) as a grading subcontractor. The contract between them required B&T's work to conform to the plans and specifications.

Giovanni Nanci, the owner of B&T, testified that it was "exclusively" the duty of B&T to ensure that the grading work was done in accordance with the plans and specifications and within the standard of care.

B&T had a contractor's license; however, its license was suspended from July 17, 2013, through August 22, 2013.

B&T, in turn, entered into a contract with R.C. Berger Construction, Inc., dba RC Grading (RC) (owned by Ronald and Carla Berger). RC did not have a contractor's license at all.

According to Carla Berger, RC is an equipment broker; it rents out equipment, with or without an operator, to construction projects. It may or may not own the equipment. Its contract with B&T merely required it to provide equipment and an operator, which would not require a contractor's license. According to Luzuriaga, however, the contract required RC to do grading work, which would require a contractor's license.

4

RC carried out grading work between July 17 and July 22, 2013; it billed B&T, on an hourly basis, a total of $3,759. The work was done by Ronald Berger, using a skip loader that RC did not own, but rather leased from one L. Moreno.

Ronald Berger worked under the supervision and control of B&T; RC never reviewed the plans and specifications for the project.

RC received full payment for its work in June.

2. *December 2013 grading work*.

In October 2013, the general contractor rehired B&T to do additional grading work. By this time, B&T was properly licensed.

Once again, B&T entered into a contract with RC. RC, in turn, contracted with Gary Cuellar, dba Cuellar Grading & Excavation. Cuellar was a licensed grading contractor. He did the work using a skip loader that he owned. He worked under the supervision and control of B&T. He did exactly what the B&T foreman told him to do. He never reviewed the plans and specifications for the project.

Cuellar carried out grading work between December 11 and 16, 2013, for which he billed RC, on an hourly basis, a total of $2,852. RC turned around and billed B&T $3,850. RC, and thus Cuellar, were never paid for the December work.

On January 30, 2014, Luzuriaga fired the general contractor. She then assumed control of the project.

5

On June 19, 2014, RC recorded a mechanic's lien against the property. Luzuriaga obtained a release of the lien by filing a bond, issued by American Contractors Indemnity Company (American).

Luzuriaga hired a different grading subcontractor to complete the project. Meanwhile, she discovered that the grading work already done, first by Ronald Berger and then by Cuellar, was not in conformance with the plans and specifications. It cost her $22,657.88 to correct their nonconforming work.

B.      *The Prior Action.*

In September 2014, RC filed an action against American to recover against the bond. As the bond required, Luzuriaga provided American with a defense.

RC was seeking the $3,850 that it had billed for the December work. On the eve of trial, American and RC settled for $2,500. On behalf of American, Luzuriaga paid RC this amount. RC then paid Cuellar $1,000. Luzuriaga also incurred attorney fees and costs.

II

STATEMENT OF THE CASE

Luzuriaga filed this action in 2016. The operative (second amended) complaint named B&T (along with Giovanni Nanci), RC (along with Ronald and Carla Berger),[1] and Cuellar as defendants. It asserted causes of action for:

---

[1]      Because the interests of Ronald and Carla Berger are aligned with RC's, references to RC, as a litigant, will include them, unless the context otherwise requires.

6

First:  Unlawful business practices (Bus. & Prof. Code, § 17200), against RC.  In support of this cause of action, it alleged that RC:

(1)  Was an unlicensed contractor; and

(2)  Recorded a mechanic's lien for "equipment, work, service, and/or materials that were not performed or provided to the Project by RC . . . ."**2**

Second:  Acting as an unlicensed contractor (Bus. & Prof. Code, § 7031), against RC;

Third and fourth:  Negligence, against RC  and Cuellar;

Fifth:  Statutory contribution, against B&T (Civ. Code, § 8470); and

Sixth:  Indemnity, against B&T.

B&T defaulted; Luzuriaga eventually obtained a default judgment against it.

Nanci filed for bankruptcy, resulting in an automatic stay of the case as against him.

Luzuriaga filed a motion for summary adjudication against RC on her first cause of action (unlawful business practices).  She argued that RC had claimed a mechanic's lien improperly, because it was only a "broker" or a "middleman," and as such, it did not actually provide any work on the project.

RC and Cuellar each filed a cross-motion for summary judgment.

---

**2**     It also alleged that RC recorded a mechanic's lien prematurely, when it had abandoned the project.  Luzuriaga did not argue this in connection with the motions for summary judgment, nor does she argue it on appeal.

7

With respect to the first (unlawful business practices) and second (unlicensed contractor) causes of action, RC argued, among other things, that it was not required to have a contractor's license because it was a "lessor of equipment and labor" rather than a contractor.

With respect to the third (negligence) cause of action, both RC and Cuellar argued, among other things, that they did not owe Luzuriaga a duty of care.

The trial court denied Luzuriaga's motion and granted RC and Cuellar's motions. It agreed that "because RC . . . merely acted to furnish an operated skip loader, it was not required to be a licensed contractor." It rejected Luzuriaga's argument that RC was not entitled to claim a mechanic's lien because it was only a go-between, in part because Luzuriaga had not pleaded this theory. Finally, it agreed that RC and Cuellar did not owe Luzuriaga a duty of care.

Luzuriaga filed a motion for leave to file an amended complaint. In January 2019, the trial court denied that motion. In February 2019, it entered separate judgments in favor of RC and Cuellar.

III

STANDARD OF REVIEW

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citation.]" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) "There is a triable issue of material fact if, and only if, the evidence would allow a

reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"Courts deciding motions for summary judgment or summary adjudication may not weigh the evidence but must instead view it in the light most favorable to the opposing party and draw all reasonable inferences in favor of that party. [Citations.]" (*Weiss v. People ex rel. Department of Transportation* (2020) 9 Cal.5th 840, 864.)

"Whether the trial court erred by granting [the] motion for summary judgment is a question of law we review de novo. [Citation.]" (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.)

IV

THE CONTRACTOR'S LICENSE REQUIREMENT

Luzuriaga contends that the trial court erred by ruling that RC was not required to be licensed.

Under the Contractors' State License Law (Bus. & Prof. Code, § 7000 et seq.), absent an exemption, it is a crime to act as a contractor without a license. (Bus. & Prof. Code, § 7028, subd. (a)(1).) An unlicensed contractor cannot "bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation . . . ." (Bus. & Prof. Code, § 7031, subd. (a).) Moreover, "a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the

9

unlicensed contractor for performance of any act or contract." (Bus. & Prof. Code, § 7031, subd. (b).)

"Contractor," as relevant here, is defined as "any person who undertakes to . . . , or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including . . . ." (Bus. & Prof. Code, § 7026.) The term "contractor" includes a subcontractor. (*Ibid.*)

*Andrew v. Conner* (1951) 101 Cal.App.2d 621 (*Andrew*) held that one who merely rents out equipment, even with an operator, is not a contractor. (*Id*. at p. 623.) There, the "defendants desired to clear, grade and level land, as well as construct a harbor and levees . . . , and . . . to accomplish their purpose they rented equipment and operators from [the] plaintiffs over which [the] defendants retained complete supervision, direction and control." (*Ibid.*) "Perhaps it is true," the court acknowledged, "that the operations here involved were such as normally come within the purview of the provisions of section 7026 of the Business and Professions Code." (*Ibid.*) In the case before it, however, they did not, because "the trial court . . . found that [the] plaintiffs did not agree to do the work for [the] defendants on a contract basis but only agreed to rent to [the] defendants certain equipment at a certain price." (*Ibid.*)

*Rodoni v. Harbor Engineers* (1961) 191 Cal.App.2d 560 is to similar effect. There, the plaintiff contracted to provide earth-moving equipment and drivers to do

10

bulldozing, excavation, grading, and surfacing. (*Id*. at pp. 561-562.) He was paid by the hour. (*Id*. at p. 562.) He "made a profit over and above the wages paid his operators and the cost of maintaining his equipment and . . . he paid his drivers' wages, social security and unemployment insurance and withheld their income tax." (*Id*. at p. 563.) Nevertheless, the court of appeal upheld the trial court's finding that he was an employee rather than a contractor. (*Id*. at pp. 561-563.) It noted that "[a]ctual supervision was by [the grading subcontractor], whose representative directed the work done by plaintiff and his drivers. Plaintiff 'had nothing to do with the supervision of the job.'" (*Id*. at pp. 562-563; see also *Contractors Dump Truck Service, Inc. v. Gregg Const. Co.* (1965) 237 Cal.App.2d 1, 7 [citing and following *Rodoni*.)

Likewise, *Dahl-Beck Elec. Co. v. Rogge* (1969) 275 Cal.App.2d 893 held that a person who sent a backhoe and an operator to the jobsite and who was paid on an hourly basis (see *id*. at p. 897) was an employee, rather than a contractor (*id*. at pp. 900-902), because the operator's "work was very much under the control and direction of plaintiff's project foreman." (*Id*. at p. 900.)

*Rodoni* and *Dahl-Beck* (though not *Andrew*) turned, in part, on the fact that the asserted contractor was held to be an employee. When all three cases were decided, former section 7053 of the Business and Professions Code exempted an employee from the license requirement, as long as "wages [are] his sole compensation." (Stats. 1949, ch. 90, § 6, p. 337.) In 1982, this section was amended so as to add two additional requirements: that the employee "does not customarily engage in an independently

established business, and does not have the right to control or discretion as to the manner of performance so as to determine the final results of the work performed." (Stats. 1982, ch. 1427, § 2, p. 5462.)

In light of this amendment, are *Andrew*, *Rodoni*, and *Dahl-Beck* still good law? *Contractors Labor Pool, Inc. v. Westway Contractors, Inc.* (1997) 53 Cal.App.4th 152 said yes.

There, the plaintiff was "in the business of furnishing skilled and unskilled temporary workers to licensed construction contractors." (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.*, *supra*, 53 Cal.App.4th at p. 156.) It supplied workers to a subcontractor for a subway project. It was paid based on the number of hours of work performed; the subcontractor controlled the workers' activities while they were on the job. (*Id.* at pp. 156-157.)

The appellate court held that the plaintiff was not a contractor, because it "only furnished laborers" and "the full supervision and control of the workers furnished . . . was the responsibility of . . . the subcontractor who actually performed the construction services on the public work." (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.*, *supra*, 53 Cal.App.4th at p. 166.) "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. . . . To effect this purpose, the law need apply only to those who actually perform or supervise the performance of construction services; it need not apply to those who only supply materials to be used by others or laborers who will be supervised by

12

others.  *Thus, a person or company in the business of supplying equipment or hiring out laborers to be supervised by others is not deemed to act in the capacity of a contractor and is not required to have a license.*  [Citations.]" (*Id*. at p. 165, italics added [citing, inter alia, *Rodoni* and *Contractors Dump Truck*].)

The appellate court further held that the 1982 amendment did not affect the result. It explained that what was critical was that the plaintiff was not a contractor within the meaning of Business and Professions Code section 7026, regardless of whether it was an employee within the meaning of Business and Professions Code section 7053. (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.*, *supra*, 53 Cal.App.4th at pp. 166-167.)

We see no reason to disagree with *Contractors Labor Pool*.  As noted, it is simply the most recent in a line of cases, all pointing in the same direction.  One leading commentator states, citing only *Andrew*, that one who "merely furnished equipment and operators to work under the supervision" of a contractor need not be licensed.  (Acret, Cal. Constr. L. Manual (2019 ed.) § 4:28.)

In 2003, the Legislature amended Business and Professions Code section 7026.1 so as to provide that the term "contractor" includes "[a] temporary labor service agency that, as the employer, provides employees for the performance of work covered by this chapter.  The provisions of this subdivision shall not apply if there is a properly licensed contractor who exercises supervision . . . and who is directly responsible for the final results of the work."  (Bus. & Prof. Code, § 7026.1, subd (c), Stats. 2003, ch. 759, § 1, p.

5718.)  This effectively codified the result in *Contractors Labor Pool*.  It did not abrogate *Contractors Labor Pool*, nor did it undermine the reasoning in *Contractors Labor Pool*.

Here, Carla Berger testified that RC was in the business of supplying equipment, with or without an operator, for construction projects.  "[RC] is not provided with the plans and specifications for a project, does not visit a project site, and does not control the performance of work on a certain project. . . .  When RC . . . provides an operator, the equipment is operated under the supervision, direction, and control of the contractor, most often the grading subcontractor, who is responsible to assure that the grading work being performed is in accordance with the plans and specifications . . . ."

In addition, Giovanni Nanci, the owner of B&T, testified that "B&T . . . retained RC . . . solely to provide operated equipment rental . . . ."  "RC . . . served as only a lessor of equipment and labor for work on the Project."  "RC . . . worked exclusively under the direction, supervision and control of B&T . . . ."

Luzuriaga claims that her objections to this testimony were erroneously overruled.  She argues that Carla Berger was never at the project site, and therefore her testimony was not based on personal knowledge.  Carla Berger, however, could properly testify to the nature of the business that RC was in; she also could properly testify to RC's patterns and practices, which she did.  Absent contrary evidence, the only reasonable inference is that RC carried out this particular project the same way it carried out others.

Luzuriaga similarly argues that Nanci's testimony was not based on personal knowledge.  However, he testified that "all Grading Work was being performed under my

14

direction, supervision and control . . . ." In addition, the facts stated were matters of which, as owner of B&T, he would reasonably have personal knowledge; in the absence of a contrary showing, this was sufficient. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2020) ¶ 10:113, pp. 10-47, 10-48; see, e.g., *People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1484.)

Next, Luzuriaga picks away at Cuellar's testimony to the effect that his work was supervised by B&T. *Cuellar's* testimony was not particularly relevant to whether *RC* was entitled to summary judgment. Unlike RC, Cuellar *had* a contractor's license. Accordingly, he was not named as a defendant in the first (unlawful business practices) or the second (unlicensed contractor) causes of action; the only cause of action against him was the third, for negligence.

Finally, Luzuriaga complains that the declarations lack detail. For example, Nanci did not specifically say that he was ever at the project site,[3] did not say when or how RC was supervised, and did not produce any supporting documentary evidence. Moreover, Ronald Berger, who actually did the work, did not submit a declaration. Nevertheless, "evidentiary objections based on lack of foundation . . . and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226.) We cannot say the

---

[3] Luzuriaga also affirmatively asserts, "Nanci . . . w[as] never at the Project site." There is no evidence of this. While he did not specifically testify that he was at the project site, he did testify, "I was responsible for assuring that elevations and surveys were correct, and that rough and fine grading work was performed in a fashion that the work would be accepted by inspectors . . . ."

trial court abused its discretion here. Luzuriaga's palladium against overly general (or even false) declarations was to take the declarants' depositions. It does not appear that she did; the evidence in connection with the summary judgment motions is singularly devoid of any deposition testimony. Thus, the declarations stand unimpeached.

Luzuriaga did not raise a triable issue of fact as to whether RC needed a contractor's license. She argues that there was a triable issue of fact as to whether RC was an equipment "lessor," because (1) it did not own either of the skip loaders that were used in July and December 2013, and (2) it did not transfer possession of the skip loaders to B&T. RC characterized itself, however, not only as a "lessor," but also as a "broker," "provid[er]," or "supplier" of equipment. Under *Contractors Labor Pool*, what is crucial is not under which of these particular categories RC falls, but whether RC was under the supervision, direction, and control of a contractor or subcontractor. The evidence showed that it was.

Luzuriaga points out that, in July 2013, when B&T was supervising RC, B&T itself was unlicensed. She argues that, because RC was not supervised by a *licensed* contractor, it must be treated as an unlicensed contractor.

*Johnson v. Silver* (1958) 161 Cal.App.2d Supp. 853, while not precisely on point, is contrary to this contention. There, Silver hired Shirey to do construction work. Shirey, in turn, hired Johnson and Hough to haul away dirt. Shirey, Johnson, and Hough were all unlicensed. Johnson and Hough sued Silver for payment. (*Id*. at p. 854.)

16

The appellate court upheld the trial court's finding that Johnson and Hough were Shirey's employees, rather than subcontractors, and therefore were not required to be licensed. (*Johnson v. Silver*, *supra*, 161 Cal.App.2d Supp. at pp. 854-855.) It further held that Johnson and Hough could recover, even though Shirey was unlicensed. (*Id.* at p. 856.) It explained that Johnson and Hough were not themselves unlicensed contractors, and "'[t]he courts will not impose penalties for noncompliance in addition to those that are provided expressly or by necessary implication.' [Citation.]" (*Ibid.*)

Here, if RC were an individual employee of B&T, it would not have to be licensed, regardless of whether B&T was properly licensed. We see no reason for a different result just because RC was not an employee. Admittedly, this fact takes it outside the safe harbor afforded to an employee under Business and Professions Code section 7053. *Contractors Labor Pool*, however, carved out a parallel safe harbor for a non-employee provider and operator of equipment. A berth in that safe harbor does require that the equipment operator must work under the supervision of a contractor, but *Contractors Labor Pool* did not require that that contractor be licensed. Rather, it explained, the purpose of the Contractors State License Law is adequately served by requiring the contractor to be licensed (even though every law can and will be broken sometimes). Like a non-employee equipment operator, an employee must work under the supervision of an employer. (See Bus. & Prof. Code, § 7053.) If the employee of an unlicensed contractor does not have to be licensed, then neither does an equipment operator supervised by an unlicensed contractor.

17

We therefore conclude that on this record, as a matter of law, RC was not a contractor and was not required to be licensed.

V

A DUTY OF CARE FOR THE PURPOSE OF NEGLIGENCE

Luzuriaga contends that the trial court erred by ruling that RC and Cuellar did not owe her a duty of care.

A.     *General Legal Background*.

"Duty is indeed the cornerstone of every negligence claim.  In California, the general rule governing duty is codified in Civil Code section 1714, subdivision (a): 'Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .'" (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 163.)  "Whether a party has a duty of care in a particular case is a question of law for the court, which we review independently on appeal.  [Citation.]" (*Ibid.*)

"'[T]he same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts.' [Citation.]" (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 551.)  "'[A] contractual obligation may create a legal duty and the breach of that duty may support an action in tort.'" (*Ibid.*)

RC and Cuellar do not dispute that their allegedly negligent performance of their contracts would be a tort.  (See *Erlich v. Menezes*, *supra*, 21 Cal.4th at pp. 550-554.)  To put it another way, they are not arguing that *B&T* could not recover from them on a

18

negligence theory. They do argue, however, that *Luzuriaga* cannot recover from them on a negligence theory, because they were not in privity of contract with her.

"California formerly followed the traditional view that no tort cause of action arises from negligent breach of a contractual duty in the absence of privity of contract between the plaintiff and defendant. [Citations.]" (6 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1327, p. 622.)

In *Biakanja v. Irving* (1958) 49 Cal.2d 647, however, the Supreme Court broke with this view and held that, under some circumstances, a contracting party may be liable to a third party for its negligent performance of a contract. (*Id*. at pp. 649-650.) It stated: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm. [Citations.]" (*Id*. at p. 650.)[4]

In *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, the Supreme Court applied the *Biakanja* factors in deciding whether an accountant who certifies a corporation's

---

[4] "The *Biakanja* considerations are similar to, but not identical with, the policy considerations set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 . . . that bear on the recognition of a duty of care among persons not parties to a business or financial transaction." (*QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 999.)

19

financial statement has a duty to investors in the corporation. It recognized that "economic injury to lenders, investors, and others who may read and rely on audit reports is certainly 'foreseeable.'" (*Id*. at p. 398.) However, after extensively reviewing the policy issues bearing on accountant liability (*id*. at pp. 384-396), it stated, "we will not treat the mere presence of a foreseeable risk of injury to third persons as sufficient, standing alone, to impose liability for negligent conduct. We must consider other pertinent factors." (*Id*. at p. 399.)

In the case before it, it found three such factors determinative. First, liability out of proportion to fault: The client has substantial control over the auditing process, and the accountant's fault is secondary to the client's. (*Bily v. Arthur Young & Co.*, *supra*, 3 Cal.4th at pp. 399-402.) Second, the possibility of private ordering (*id*. at pp. 402-403): "[T]he third party in an audit negligence case . . . can 'privately order' the risk of inaccurate financial reporting by contractual arrangements with the client. [Citation.]" (*Id*. at p. 403.) "This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources." (*Ibid*.) Third, adverse societal effects (*id*. at pp. 404-405): "[W]e doubt whether audits can be done in ways that would yield significantly greater accuracy without disadvantages. [Citation.]" (*Id*. at p. 404.) "[T]he economic result of unlimited negligence liability could just as easily be an increase in the cost and decrease in the availability of audits and audit reports with no compensating improvement in overall audit quality. [Citations.]" (*Id*. at pp. 404-405.)

20

The court therefore held that "an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client . . . ." (*Bily v. Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 406.) However, it also held that a "narrow class of persons" (*ibid*), namely "specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report," (*id.* at p. 407), can recover on a theory of negligent misrepresentation. (*Id.* at pp. 407-412.)

Luzuriaga argues that it is established that a subcontractor owes a duty to the property owner, and therefore the trial court erred by even considering the *Biakanja* factors. Not so. "The liability of a contractor or subcontractor must be determined by applying th[e] general [*Biakanja*] test rather than by arbitrarily placing them in a separate category subject to a special rule. [Citation.]" (*Stewart v. Cox* (1961) 55 Cal.2d 857, 863.)

B.      *Key Cases in the Construction Context*.

There are three leading cases applying the *Biakanja* factors to the question of whether, in the construction context, an entity not in privity of contract with the owner nevertheless owes the owner a duty of care.

1.      *Stewart v. Cox*.

In *Stewart v. Cox*, *supra*, 55 Cal.2d 857, the Supreme Court held that a subcontractor that negligently applied gunite during the construction of a swimming pool did owe the owner a duty of care. (*Id.* at pp. 861-863.) It stated: "Here it was obvious that the pool for which [the subcontractor] provided the gunite work was intended for the

21

plaintiffs and that property damage to them — and possibly to some of their neighbors — was foreseeable in the event the work was so negligently done as to permit water to escape. It is clear that the transaction between [the contractor] and [the subcontractor] was intended to specially affect plaintiffs. There is no doubt that plaintiffs suffered serious damage, and the court found, supported by ample evidence, that the injury was caused by [the subcontractor's] negligence. Under all the circumstances [the subcontractor] should not be exempted from liability if negligence on his part was the proximate cause of the damage to plaintiffs." (*Id*. at p. 863; see also *Stonegate Homeowners Assn. v. Staben* (2006) 144 Cal.App.4th 740, 748 ["'The owner ordinarily has a cause of action against the subcontractor arising from the subcontractor's defective work, even though there is no privity of contract between the owner and the subcontractor.'"]; 9 Miller & Starr, Cal. Real Estate (4th ed. 2015) § 33:25, p. 33-144 [same].)

> 2. *Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*

Our trial court found no duty mainly because it relied on *Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.* (2004) 125 Cal.App.4th 152. We therefore discuss that case in some detail.

In *Weseloh*, property owners hired a general contractor, who in turn hired a retaining wall subcontractor, who in turn hired engineers to design and inspect the retaining walls. (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*,

22

*supra*, 125 Cal.App.4th at pp. 159-160.) A portion of the retaining walls failed (*id*. at p. 160), and litigation ensued. The trial court granted summary judgment for the engineers, ruling that they did not owe a duty to the owners. (*Id*. at p. 161.)

The appellate court held that the owners failed to show that, under the *Biakanja* factors, the engineers had a duty of care. (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at pp. 166-173.)

First, it noted that the engineers contracted only with the wall subcontractor, and there was no third-party beneficiary clause in that contract. It concluded that the engineers' work was "primarily" to benefit the subcontractor. (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at p. 167.)

Second, it conceded that "it is generally foreseeable a design defect could result in the failure of a retaining wall." (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at p. 168.) It concluded, however, that "[the owners] failed to produce evidence showing how and the extent to which their damages were caused by the asserted design defects. This is a significant fact in light of the absence of evidence showing [the engineers'] design was followed without alteration." (*Ibid*.) It stated that, due to "the insufficiency of the evidence on causation in this case, we give the factor of foreseeability limited weight." (*Ibid*.)

Third, again because it found insufficient evidence of causation, it found that there was no close connection between the engineers' conduct and the owners' injury.

23

(*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at pp. 168-169.)

Fourth, it found no evidence of moral blame; it noted that "[the owners'] opening brief does not even argue the trial court should have concluded [the engineers'] conduct implicated moral blame." (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at pp. 168-169.)

Fifth, regarding the policy of preventing future harm, *Weseloh* found "no evidence supporting an argument that greater care in design engineering would result from expanded liability." (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at p. 170.) It added that the owners "are not without [a] remedy," because they could sue the general contractor, who could sue the subcontractor, who could sue the engineers. (*Ibid*.)

The court also considered the three additional factors set forth in *Bily*. It was concerned about liability out of proportion to fault, because the engineers had been paid $2,200, whereas the owners were claiming $6,000,000 in damages. (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at pp. 171-172.) It found a possibility of private ordering, because the owners could have "negotiat[ed] a clause naming them the intended beneficiaries in contracts related to the project and expressly providing for the right to pursue claims directly against subcontractors" and "could have required they be named as additional insureds on all insurance policies covering the risks of defective workmanship of subcontractors." (*Id*. at

24

p. 172.) Finally, it concluded that "there is no evidence supporting a policy 'to favor the alleged tortfeasor over the alleged victim as an effective distributor of loss.' [Citation.]" (*Ibid.*)

   3. *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP.*

  The third leading case is *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568. There, the Supreme Court held that two architectural firms that designed homes did owe a duty of care to a homeowner's association, as representative of the subsequent purchasers of those homes. (*Id*. at p. 571.) It explained: "(1) Defendants' work was intended to benefit the homeowners living in the residential units that defendants designed and helped to construct. (2) It was foreseeable that these homeowners would be among the limited class of persons harmed by the negligently designed units. (3) Plaintiff's members have suffered injury; the design defects have made their homes unsafe and uninhabitable during certain periods. (4) In light of the nature and extent of defendants' role as the sole architects on the Project, there is a close connection between defendants' conduct and the injury suffered. (5) Because of defendants' unique and well-compensated role in the Project as well as their awareness that future homeowners would rely on their specialized expertise in designing safe and habitable homes, significant moral blame attaches to defendants' conduct. (6) The policy of preventing future harm to homeowners reliant on architects' specialized skills supports recognition of a duty of care." (*Id*. at p. 586.)

The court distinguished *Bily* on three grounds:  "(1) the closeness of the connection between defendants' conduct and plaintiff's injury; (2) the limited and wholly evident class of persons and transactions that defendants' conduct was intended to affect; and (3) the absence of private ordering options that would more efficiently protect homeowners from design defects and their resulting harms."  (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, *supra*, 59 Cal.4th at p. 581.)

"First, unlike the secondary role played by the auditor in the financial reporting process, defendants' primary role in the design of the Project bears a '"close connection"' to the injury alleged by plaintiff.  [Citation.]"  (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, *supra*, 59 Cal.4th at p. 581.)  "An architect providing professional design services to a developer does not operate in a 'client-controlled environment' comparable to the relationship between an auditor and its client.  [Citation.]"  (*Id*. at p. 582.)  The court also stressed that "defendants played a lead role not only in designing the Project but also in implementing the Project design."  (*Id*. at p. 583.)

"Second, recognizing that an architect who is a principal provider of professional design services on a residential building project owes a duty of care to future homeowners does not raise the prospect of '"liability in an indeterminate amount for an indeterminate time to an indeterminate class."'  [Citation.]"  (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, *supra*, 59 Cal.4th at p. 583.)  It declined to rely on the fact that the homeowners were not third-party beneficiaries of the

26

architects' contracts, stating, "we have never held that third party beneficiary status is a prerequisite to alleging negligence." (*Id.* at p. 584.)

"Third, the prospect of private ordering as an alternative to negligence liability is far less compelling . . . than in *Bily*." (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, *supra*, 59 Cal.4th at p. 584.) An ordinary homeowner has no construction expertise and cannot negotiate "'meaningful protective changes in the conveyancing documents prepared by the builder vendor . . . .'" (*Id.* at pp. 584-585.) The court found it "questionable" that allowing the homeowner to sue the developer "will consistently provide adequate redress" and noted that "the chief interest of prospective homeowners is to avoid purchasing a defective home, not only to have adequate redress after the fact." (*Id.* at p. 585.)

Last but not least, the Supreme Court also distinguished *Weseloh*, on two grounds. In *Weseloh*, the engineers had had the "limited role" of assisting the wall subcontractor with its calculations, but in *Beacon*, the architects "were the sole entities providing architectural services to the Project." (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, *supra*, 59 Cal.4th at pp. 586-587.) Also, in *Weseloh*, there was insufficient evidence of causation, but in *Beacon*, there was "no similar causation problem . . . ." (*Beacon, supra*, at p. 587.)

C. *Forfeiture*.

Preliminarily, RC contends that Luzuriaga forfeited any contention that the *Biakanja* factors weigh in her favor by failing to raise it below.

27

In its motion for summary judgment, RC and Cuellar argued that, based on the application of the *Biakanja* factors, they did not owe Luzuriaga a duty of care. In opposition, Luzuriaga did not address each of the *Biakanja* factors separately. However she did argue that cases such as *Stewart* had applied the *Biakanja* factors in the construction context and had held, as a result, that a subcontractor owes the owner a duty of care.

Thus, there was no forfeiture. Ultimately, the trial court declined to follow *Stewart*, because it had already ruled (for licensing purposes) that RC and Cuellar were not subcontractors. Instead, it accepted RC and Cuellar's argument. It is therefore appropriate for Luzuriaga to argue — albeit in more detail than she did below — that the *Biakanja* factors, as applied in cases such as *Stewart*, support a duty here.

RC also argues, more specifically, that Luzuriaga did not argue below that (1) *Weseloh* is not controlling, or (2) *Beacon* is controlling. We are not aware of any law that a litigant cannot cite a new case on appeal or cannot assert a new distinction of an old case. In fact, such fine-tuned approaches to the case law are probably more common on appeal than not.

D.      *Synthesis and Analysis*.

We proceed to apply the *Biakanja* factors here in light of *Stewart*, *Weseloh*, and *Beacon*.

(1) The extent to which the transaction was intended to affect the plaintiff: As in *Weseloh*, there was no third-party beneficiary clause in the relevant contracts, but under

28

*Beacon,* this is not determinative. It has been said that "[t]he owner is . . . an intended beneficiary of the subcontractor's contract with the general contractor. . . ." (*Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1469.) It would seem that the owner is equally an intended beneficiary of a subcontractor's contract with an equipment operator or lessor.

As in *Stewart*, it was obvious that the grading work was ultimately intended to benefit the owner, and that if it were done negligently, the owner would be damaged. Cuellar testified that he did not know who the owner was, but he could hardly claim he did not know there *was* an owner.

The trial court distinguished *Stewart* on the ground that RC and Cuellar were not subcontractors. In part VI, *ante*, we agreed that they were not subcontractors within the meaning of the Contractors State License Law. For present purposes, however, the question is not whether they were subcontractors as thus defined, but rather whether they are more analogous to the subcontractor in *Stewart*, on one hand, or to the engineers in *Weseloh*, on the other hand.

*Beacon* indicated that the controlling distinction between the two is whether the project participant had a limited role or contributed to the project as a whole. Here, RC and Cuellar contributed only to the grading; moreover, each of them did only part, not all, of the grading. Thus, the transaction was primarily intended to benefit B&T, rather than Luzuriaga.

29

(2) The foreseeability of harm to the plaintiff: As in *Stewart* and *Beacon*, it was obvious that negligent performance by the defendants would cause damages to the property owner. *Weseloh* discounted this factor, because in that case, there was no evidence that the plaintiff's damages were actually caused by the defendants' negligent performance. Here, by contrast, there was uncontradicted evidence of causation.

*Bily* held, however, that "the mere presence of a foreseeable risk of injury to third persons [is not] sufficient, standing alone, to impose liability for negligent conduct." (*Bily v. Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 399.)

(3) The degree of certainty that the plaintiff suffered injury: Once again, as in *Stewart* and *Beacon*, and unlike in *Weseloh*, there was ample evidence of causation. And Luzuriaga is the main injured party. This is not a situation, as in *Bily*, in which there is some large and nebulous class of potential plaintiffs. The general contractor and B&T might have some cause of action against RC and Cuellar, but only because Luzuriaga has a cause of action against all of them.

(4) The closeness of the connection between the defendant's conduct and the injury suffered: In one sense, the connection was close; RC and Cuellar did the grading, and the grading was defective. In a more important sense, however, it was not close. Nanci testified that it was B&T's duty to see to it that the grading work was done in accordance with the plans and specifications, and moreover that this was B&T's duty "exclusively" — i.e., to the exclusion of RC and Cuellar. For this reason, he did not show RC or Cuellar the plans and specifications. As he owned B&T, which was a

30

(usually) licensed grading contractor, he was qualified to testify as an expert. And his testimony on this point was uncontradicted. Cuellar testified that he did exactly what the B&T foreman told him to do.

Indeed, it is hard to see how RC and Cuellar were allegedly negligent. To the extent that they supplied equipment, they were not; there is no allegation that the equipment was defective, that it was not appropriate for the task, or that it somehow caused the grading to deviate from the plans and specifications.[5] To the extent that they operated equipment, they did so under B&T's supervision; according to Nanci, this was consistent with the standard of care in the industry. However, it is possible that some of the deviations from the plans and specifications were obvious. In any event, RC and Cuellar did not move for summary judgment on the ground that they were not negligent; it is possible that, had they done so, Luzuriaga could and would have introduced additional evidence.

We therefore assume that RC and Cuellar were negligent. Even if so, B&T had the closest connection to Luzuriaga's alleged injury; RC and Cuellar were one step removed, and, on this record, only tangentially responsible for it, at best.

---

[5]    RC contends that a holding that it has a duty "would have a devastating effect on business establishments, such as Home Depot, Loews [*sic*], United Rentals, etc., who rent equipment and cannot control its proper use or application in the field, in the event claimed deficiencies in construction are caused by the lessee of such equipment." However, because Luzuriaga seeks to hold RC and Cuellar liable as equipment operators, not as equipment suppliers, this concern is misplaced.

31

(5) The moral blame attached to the defendant's conduct: *Stewart* did not specifically discuss moral blame; either it felt that negligence is morally blameworthy per se or that the absence of moral blame did not outweigh the other factors. *Weseloh* found no moral blame; that finding, however, may have been influenced by the fact that it also found no causation. *Beacon* found that the defendants' negligent performance of their "unique and well-compensated role in the Project as well as their awareness that future homeowners would rely on their specialized expertise in designing safe and habitable homes" gave rise to "significant moral blame." (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, *supra*, 59 Cal.4th at p. 586.)

Here, unlike in *Beacon*, RC and Cuellar did not provide specialized expertise and were not particularly well-compensated. As discussed above, it was B&T that was supposed to provide the specialized expertise. This means that B&T took primary moral blame for any negligent grading; RC and Cuellar had only secondary moral blame or no moral blame at all, depending on how you look at it. In this situation — where there was a more blameworthy joint tortfeasor — the moral blame factor militates against a duty. (*K.G. v. S.B.* (2020) 46 Cal.App.5th 625, 628-629, 633 [father who provided financial support to his son, who used the money to buy drugs that killed his girlfriend, had no moral blame]); *State Ready Mix, Inc. v. Moffatt & Nichol* (2015) 232 Cal.App.4th 1227, 1230-1231, 1233-1234 [design engineer who gratuitously reviewed concrete mix designed and prepared by concrete supplier had no moral blame].)

Luzuriaga argues that RC is morally blameworthy because it performed unlicensed grading work. As we held in part IV, *ante*, however, it was not required to be licensed.

Luzuriaga also argues that Cuellar is morally blameworthy because he was a licensed contractor, and a licensed contractor is subject to discipline for "[a] willful departure from or disregard of plans or specifications in any material respect, which is prejudicial to another . . . ." (Bus. & Prof. Code, § 7109, subd. (b).) However, as we held with respect to RC in part IV, *ante*, Cuellar was not doing work that required a contractor's license.[6] In any event, the violation of such a regulatory statute is not inherently morally blameworthy.

(6) The policy of preventing future harm: As a general rule, it would seem that the more project participants who have a duty of care, the more future harm is prevented. *Weseloh* found no evidence "that greater care . . . would result from expanded liability" (*Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.*, *supra*, 125 Cal.App.4th at p. 170); however, the presumption that it would, unless proven otherwise, is fundamental to the law of negligence.

The law of negligence, however, is not the only body of law involved here. Luzuriaga also had the option of suing for breach of contract. As discussed above, it

---

[6] The Contractors State License Board can take disciplinary action against a licensed contractor, even if it was not acting in that capacity by virtue of one of the exemptions to the licensing requirement set forth in Business and Professions Code section 7044 [owner-builder], 7045 [non-fixtures], 7046 [personal property], or 7048 [project under $500]. (Bus. & Prof. Code, § 7090.) By negative implication, it *cannot* take disciplinary action against a licensed contractor that was not acting in that capacity for some *other* reason.

33

would seem that she is a third-party beneficiary of the contracts with RC and Cuellar. But even if she is not, she could sue B&T, which most likely would just turn around and sue RC and Cuellar. It does not appear that holding RC and Cuellar liable directly to Luzuriaga for negligence is necessary to further the policy of preventing future harm.

So far, then, the *Biakanja* factors are something of a mixed bag. Numerically, four of the factors weigh in favor of a duty, and only two weigh against (one of which the Supreme Court has told us is not determinative). Of course, we are to evaluate them qualitatively, not just quantitatively; alas, the case law does not clearly lay out how we are to go about doing so.

We therefore turn to the three additional *Bily* factors.

(1) Liability out of proportion to fault: *Bily* held that this factor applied in the case before it, because the accountant's fault was secondary to the client's. (*Bily v. Arthur Young & Co.*, *supra*, 3 Cal.4th at pp. 399-402.) Here, as discussed above, it is hard to see how RC and Cuellar were negligent at all, but even if they were, their fault was secondary to B&T's.

(2) The prospect of private ordering: As *Weseloh* held, an owner can protect itself by contractually requiring every project participant to be liable to the owner for failing to follow the plans and specifications. Here, however, the contract was an AIA form. It provided that the contractor and any subcontractor were to be bound by the plans and specifications; a sub-subcontractor, however, was to be bound only "[w]here

34

appropriate." It seems unlikely that Luzuriaga could have negotiated a change to this language. We conclude that this factor does not particularly favor either side.

(3) Adverse societal effects: According to Nanci, the custom in the industry is that the grading subcontractor is responsible for compliance with the plans and specifications; a provider of operated equipment is not. The AIA form contract is consistent with this testimony; it gives a contractor the option not to require a subcontractor to be bound by the plans and specifications, where appropriate. Luzuriaga does not point to any adverse societal effects resulting from this custom.

If we were to hold that RC and Cuellar had a duty to Luzuriaga, the likely result would be greater risk and — assuming insurance for this risk is even available — higher insurance premiums for small construction businesses. The supply of their services would go down and the price for those services would go up. In the absence of any apparent problems resulting from the existing custom, we see no justification for this.

In sum, then, the *Biakanja* factors, when combined with the *Bily* factors, point to the conclusion that RC and Cuellar had no duty of care toward Luzuriaga. The key facts that favor Luzuriaga are that she was undoubtedly damaged, and that she is the main member of a small class of foreseeable plaintiffs. The key fact that favors RC and Cuellar is that, under the contract documents and under the custom in the industry, they had only a limited role in the project, and it was not their responsibility to ensure that the grading conformed to the plans and specifications. The latter fact plays into many of the *Biakanja* and *Bily* factors and strongly influences our evaluation of them.

35

We therefore conclude that the trial court correctly held that RC and Cuellar did not owe Luzuriaga a duty of care.

## VI

## RC'S ENTITLEMENT TO CLAIM A MECHANIC'S LIEN

In connection with her first (unlawful business practices) cause of action, Luzuriaga contends that RC was not entitled to claim a mechanic's lien.

Civil Code section 8400 provides:  "*A person that provides work authorized for a work of improvement*, including, but not limited to, the following persons, has a lien right under this chapter:

"(a)  Direct contractor.

"(b)  Subcontractor.

"(c)  Material supplier.

"(d)  Equipment lessor.

"(e)  Laborer.

"(f)  Design professional."  (Italics added.)

Luzuriaga argues that RC was not an "[e]quipment lessor" or a "[l]aborer."  More generally, she also argues that RC did not actually "provide[] work for [the] work of improvement" (Civ. Code, § 8400), because it merely acted as a middleman for the labor and equipment of others (i.e., Ronald Berger, L. Moreno, and Cuellar).

On this cause of action, the trial court denied Luzuriaga's motion for summary adjudication — and granted RC's cross-motion for summary adjudication — for two

36

alternative reasons: (1) because Luzuriaga had not pleaded this theory; and (2) because RC was entitled to claim a mechanic's lien.

Luzuriaga contends that she did adequately plead this theory. Her first cause of action was almost entirely taken up by allegations that RC was an unlicensed contractor. However, one paragraph additionally alleged that: "RC['s] claim of lien includes equipment, work, service, and/or materials that were not performed or provided to the Project by RC . . . ."

The commonsense meaning of this is that RC demanded payment for something that it never actually did. Evidently that is how RC and the trial court read it.

Luzuriaga is now arguing that, even though RC actually did something, it was not qualified to claim a mechanic's lien because what it did was not "work" and was not done on a "work of improvement." Once you know that, it is possible to look back at the crucial paragraph, to realize that it is ambiguous, and to see how it could be read as asserting this argument.

Nevertheless, it was insufficient to raise this theory for purposes of summary judgment. A complaint must contain "[a] statement of the facts constituting the cause of action, in ordinary and concise language." (Code Civ. Proc., § 425.10, subd. (a)(1).) "This fact-pleading requirement obligates the plaintiff to allege ultimate facts that 'as a whole apprise[] the adversary of the factual basis of the claim. [Citations.]' [Citation.]" (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 886.) "The requirement to specifically plead facts in a complaint is to apprise the defendant of the

37

circumstances upon which plaintiff relies and to prevent defendant from being taken by surprise." (*Frisvold v. Leahy* (1936) 15 Cal.App.2d 752, 756.)

Here, Luzuriaga's construction of her own allegation was not its ordinary meaning. Significantly absent was the essential fact that RC was acting only as a broker or middleman. Indeed, the same cause of action alleged, to the contrary, that "RC . . . performed unlicensed contractor's work on the Project . . . ." (Capitalization altered.) While Luzuriaga would have been *allowed* to plead inconsistent allegations, she never actually *did* plead the entirely inconsistent allegation that RC acted only as a middleman for work performed by others. As a result, the crucial paragraph did not reasonably apprise RC of Luzuriaga's present contention.

"'The pleadings define the issues to be considered on a motion for summary judgment.' [Citation.]" (*Lowe v. California League of Prof. Baseball* (1997) 56 Cal.App.4th 112, 122.) "Summary judgment cannot be granted on a ground not raised by the pleadings. [Citation.] Conversely, summary judgment cannot be denied on a ground not raised by the pleadings. [Citations.]" (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663, italics omitted.)

Finally, Luzuriaga quotes *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141 to the effect that: "Whatever the state of the pleadings, when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what

38

public policy forbids.  [Citations.]"  (*Id*. at pp. 147-148.)  This quotation (if it applies in the context of summary judgment at all) might apply to Luzuriaga's theory that RC was an unlicensed contractor (see *ibid*.), but it does not apply to her theory that RC was not entitled to claim a mechanic's lien.  Even if RC was claiming a mechanic's lien when it was not entitled to do so, it was nevertheless owed the money; it was not seeking "to enforce an illegal contract" nor to "recover compensation for an illegal act."

We therefore conclude that Luzuriaga forfeited this theory for purposes of summary judgment.

VII

DENIAL OF LEAVE TO AMEND

Anticipating our holding that she did not adequately plead her theory that RC was not entitled to claim a mechanic's lien (see part VI, *ante*), Luzuriaga contends that the trial court erred by denying her leave to amend so as to allege this theory.

A.    *Additional Factual and Procedural Background*.

In opposition to Luzuriaga's motion for summary adjudication, RC argued that she had not pleaded this theory.  Thus, in her reply memorandum, in a single sentence, Luzuriaga requested leave to amend, "if needed."  Even though she had not requested oral argument, she appeared on the date set for hearing and reiterated her request for

39

leave to amend.**7** The trial court responded, "I think you're going to have to file a motion . . . ."

About two and a half months later, Luzuriaga filed a motion for leave to file a third amended complaint. The trial court denied that motion.

B.      *Discussion.*

As already discussed (see part VI, *ante*), the pleadings define the issues to be considered on a motion for summary judgment. At that stage of the proceedings, Luzuriaga could not amend her complaint without leave of court. (Code Civ. Proc., § 472.) And she could not obtain leave of court without a noticed motion, which had to include a copy of the proposed amended complaint. (Code Civ. Proc., §§ 473, subd. (a)(1), 1005, subd. (a)(13); Cal. Rules of Court, rule 3.1324(a).)

Cases do state that a request for leave to amend may be made at or before the hearing on a motion for summary judgment (e.g., *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1257), but this cannot be read as excusing the requirement of a duly noticed motion. What Luzuriaga should have done was to file a motion for leave to amend, together with a motion (or ex parte application) for a continuance of the hearing on the pending summary judgment/summary adjudication motions, to allow her motion for leave to amend to be heard first. Her request for leave to amend in her reply memo

---

**7**      Luzuriaga characterizes the hearing as a trial setting conference. A trial setting conference had been set for the same date, but the trial court continued it. Thus, it was solely a hearing on the motion for summary judgment.

was ineffective. Her oral request at the hearing (even if we were to view that hearing as a trial setting conference) was likewise ineffective.

There is a split of opinion as to whether a motion for leave to amend can be filed after a motion for summary judgment has been granted but before judgment has been entered. (See *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648, fn. 24; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2020) ¶ 10:52.6 at p. 10-27, and cases cited.) We therefore assume, without deciding, that the trial court still had the *authority* to grant the motion for leave to amend, provided Luzuriaga showed good cause.

Even if so, she has not shown that the trial court erred by denying her motion. "The denial of leave to amend is reviewed under an abuse of discretion standard. [Citation.]" (*Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2015) 237 Cal.App.4th 23, 28.) In opposition to the motion for leave to amend, RC argued, among other things, that Luzuriaga had failed to show that she filed the motion promptly after learning the underlying facts.

"The law is . . . clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may — of itself — be a valid reason for denial. . . . [T]he denial may rest upon the element of lack of diligence in offering the amendment after knowledge of the facts, or the effect of the delay on the adverse party. [Citations.]" (*Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 939-940.) Luzuriaga does not even argue that she demonstrated diligence. Thus, she has forfeited this argument. In

41

any event, she admitted in her motion that she had known since January 2017 that RC claimed to be acting as a broker.  Discovery was complete by March 2018.  RC's status as a broker was the major premise of her motion for summary adjudication, filed in June 2018.  We therefore sustain the denial.

## VIII

## DISPOSITION

The judgment is affirmed.  RC (including Ronald and Carla Berger) and Cuellar are awarded costs on appeal against Luzuriaga.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

MILLER
J.

MENETREZ
J.

42